# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00786-SCT

*BRYAN KOLBERG a/k/a BRYAN JOSEPH KOLBERG*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/12/2000 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CLIVE ADRIAN STAFFORD SMITH |
| | ANDRE DeGRUY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | EDWARD PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/29/2002 |
| MOTION FOR REHEARING FILED: | 9/12/2002; denied 10/31/2002 |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. This is Bryan Kolberg's second time before us. He was indicted on October 11, 1988, for the August 24, 1988, death of twenty-two month-old Madison Watson. Kolberg's first trial began on December 3, 1990, and at the conclusion of the guilt/innocence phase of the trial, the jury found Kolberg guilty of capital murder. This same jury subsequently sentenced Kolberg to death. On appeal, this Court reversed and remanded both the conviction and sentence. *See* **Kolberg v. State**, 704 So.2d 1307 (Miss. 1997).

¶2. Kolberg's second trial began on February 22, 2000, and at the conclusion of that trial, the jury likewise found Kolberg guilty of capital murder; however, this second jury was unable to unanimously agree on punishment. Consequently, pursuant to Miss. Code Ann. § 99-19-103, the trial court imposed upon Kolberg a mandatory sentence of life imprisonment. Kolberg's subsequently filed post-trial motions were

denied, and Kolberg has now timely perfected his appeal of the conviction of capital murder and sentence of life imprisonment to this Court.

## FACTS

¶3. Bryan Kolberg lived with Laurel Watson and Laurel's infant daughter Madison for roughly a month. On August 19, 1988, Kolberg was at home with Madison while Laurel was at work. Kolberg's version of events was that he had driven Laurel to work around 8:00 a.m. and that Madison was in the car with them. Kolberg said that he and Madison returned to Laurel's house, where the two remained until later in the morning when he drove with Madison back to Laurel's place of employment. They remained there for approximately an hour.

¶4. Kolberg stated that upon returning to the house, he placed Madison in bed for a nap while he watched television. He heard a thump in the bedroom and went to check on Madison. When he entered the bedroom, he saw that she had fallen off the bed and was lying on the floor. Kolberg said that Madison only whimpered a little bit and he placed her back on the bed and she went back to sleep. Kolberg also said that he later returned to the bedroom to wake Madison to take her with him to pick Laurel up from work. He claimed that Madison would not wake up, so he took her to the emergency room sometime around 4:00 p.m. Madison was treated for head injuries, but to no avail. She remained in a coma for five days until she died on August 24, 1988.

¶5. Kolberg argued before the jury that he was not responsible for the injuries which ultimately caused Madison's death. He asserted that the injuries were either exclusively sustained as a result of Madison's fall from the bed or that her death resulting from the fall was caused in part by an earlier injury. The jury apparently agreed with the prosecution's theory that Kolberg struck Madison in the back of the head.

## DISCUSSION

¶6. Counting subparts, Kolberg assigns approximately fifty-nine (59) perceived errors by the trial court for us to consider. We will address as many of these assignments of error as deemed appropriate.

### I. WHETHER THE EVIDENCE FAILS TO EXCLUDE ANY REASONABLE POSSIBILITY THAT NO CRIME OCCURRED.

¶7. The prosecution's case against Kolberg was based on circumstantial evidence. It is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to the height which will exclude every reasonable doubt; that when in any essential respect the State relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis than that the contention of the State is true, and that throughout the course of the trial, the burden of proof is on the State. It is our duty here to maintain these principles. *Steele v. State*, 544 So.2d 802, 808 (Miss. 1989) (quoting *Hester v. State*, 463 So.2d 1087, 1093 (Miss. 1985) and *Hemphill v. State*, 304 So.2d 654, 655 (Miss. 1974) quoting *Westbrook v. State*, 202 Miss. 426, 32 So.2d 251, 251 (1947)). We must accept the evidence in the light most favorable to the State, including all reasonable, favorable inferences. *Steele*, 544 So.2d at 809.

¶8. Kolberg asserts that his expert testimony proved that "Madison must have [either] fallen from the bed to the floor (a distance of some three feet), or she must have exacerbated an injury that she had previously received, or both." Specifically, he asserts that the testimony of his expert witnesses established other

reasonable hypotheses, and that consequently, the State did not meet its burden of proof.

¶9. In *Kolberg I* we said:

> We have held in numerous cases that the jury is the sole judge of the credibility of the witnesses and the weight to be attached to their testimony. We have further said that we will not set aside a guilty verdict, absent other error, unless it is clearly a result of prejudice, bias or fraud, or is manifestly against the weight of credible evidence. *Cromeans v. State*, 261 So.2d 453 (Miss. 1972); *Marr v. State*, 248 Miss. 281, 159 So.2d 167 (1963); and *Freeman v. State*, 228 Miss. 687, 89 So.2d 716 (1956).

*Kolberg I*, 704 So. 2d at 1311. The State correctly notes that on Kolberg's first appeal we held that the evidence was sufficient to support the jury's finding of guilt for capital murder. *See Kolberg*, 704 So.2d at 1311-12. Thus, the State argues that this Court's decision in Kolberg's first appeal is controlling under "the law of the case" doctrine. The State, in citing *Tunstall v. State*, 767 So.2d 167 (Miss. 1999), asserts that in Mississippi the law of the case is:

> [A] doctrine [that] is similar to that of former adjudication. [It] relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.

The State accurately recites the well known "law of the case doctrine", but in reality, this doctrine was not utilized in the majority opinion in *Tunstall*, but instead is found in Justice McRae's dissent, with citation to *Fortune v. Lee County Bd. of Supervisors*, 725 So.2d 747, 751 (Miss. 1998), quoting *Simpson v. State Farm Fire & Cas. Co.*, 564 So.2d 1374, 1376 (Miss. 1990). In *Simpson,* this Court stated:

> The rule is distinct from the rule of stare decisis and it is not a limitation upon the power of a court.[1] (Internal citations omitted). But if the facts are different, so that the principles of law announced on the first appeal are not applicable, as where there are material changes in the evidence, pleadings or findings, a prior decision is not conclusive upon questions presented on the subsequent appeal. (Citations omitted). . .We do not think, however, that this rule is so fixed and binding upon the court that it may not depart from its former decision on a subsequent appeal if the former decision in its judgment after mature consideration is erroneous and wrongful and would lead to unjust results. Where the facts are the same, and where there has been no change of conditions or situations as that a change of decision would work wrong and injustice, the court may, on the subsequent appeal, correct its former decision where it is manifestly wrong.

564 So.2d at 1376-77.

¶10. While the State makes a laudable argument, inasmuch as a substantial amount of Kolberg's evidence was the same in both trials, there are significant differences. One of the State's witnesses from the first trial did not testify at the second trial. In the second trial, Kolberg called three expert witnesses who did not testify in the first trial. Kolberg also distinguishes the two trials by stating that he presented a "second impact" theory in the second trial which he did not present in the first. While we agree with the State that it is

the similarity of facts and not the similarity of witnesses that is the key to this doctrine, we are constrained to find here that, based on the record before us, the doctrine does not apply in the case before us today.

¶11. Kolberg relies on *Steele v. State*, 544 So.2d 802 (Miss. 1989); *Wheeler v. State*, 536 So.2d 1341 (Miss. 1988); *Hester v. State*, 463 So.2d 1087 (Miss. 1985); *Biles v. State*, 338 So.2d 1004 (Miss. 1976); and *Bell v. State*, 207 Miss. 518, 42 So.2d 728 (1949) to support his assertion that the State failed to meet its burden of proof. Specifically, he asserts that "[t]he facts of *Steele v. State* are very difficult to distinguish from this case." It is true that we held the evidence in *Steele* insufficient "to establish anything more than a probability of guilt and did not 'invest mere circumstances with the force of truth.'" 544 So.2d at 809.

¶12. In *Steele*, the defendant was found guilty of the capital murder of twenty-three month old Christina Sinclair. Steele and Christina's mother, Kathy, had begun dating and Steele occasionally babysat Christina. On the evening of October 10, 1984, Steele was babysitting Christina and said that she fell out of bed. He placed her back in the bed and when he returned to check on Christina, her eyes were rolled back in her head and she was gagging. An ambulance was dispatched to the residence and Christina was taken to the hospital. X-rays and CAT scans showed massive fracturing on the right side of Christina's skull and swelling on the right hemisphere of her brain. At trial, a nurse who cared for Christina testified that there were also several areas of burns on the child's body. The State's expert witnesses testified that the injuries to Christina's head were too severe to be consistent with Steele's version of events. The jury agreed with the State and found Steele guilty of capital murder and sentenced him to life imprisonment.

¶13. Steele's argument before us was that he should have been granted a judgment of acquittal notwithstanding the verdict because the State failed to prove criminal agency beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. We agreed. We said that the reasonable hypothesis that Christina's injury was an accident could not be excluded. *Id.* at 809. The *Steele* Court went on to state:

> It is always insufficient where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for *it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth*. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such existence cannot amount to proof, however great the probability may be.

*Id.* at 809 (emphasis in original) (citing *Hester v. State*, 463 So.2d at 1094 (quoting *Algheri v. State*, 25 Miss. 584, 589 (1853)). The nurse testifying about the burns on the child's body also said that those burns could have been inflicted a day or two prior to the day Steele babysat her. *Id.* at 809. The State's witnesses thought that the child probably did not sustain her head injury by falling from the bed. *Id.* However, we noted that the State's witnesses were never asked if the child could have sustained those head injuries while jumping on the bed or climbing on the chest-of-drawers located near her bed. *Id.* We thought that the evidence presented at trial tipped the scales in favor of the State's arguments, but "more probable than not" was simply insufficient to support the jury's verdict.

¶14. Turning to the present case, there was evidence presented that Madison was an abused child. However, her death was caused by the brain injuries she sustained. Testimony at trial established that she was normal, by all indications, when Kolberg took Madison to see Laurel at work around 1:00 p.m. or

1:30 p.m. Madison was in the emergency room sometime shortly before 4:00 p.m. The State's expert witnesses all believed that the injury which ultimately caused her death occurred during that roughly two and one-half to three hour period of time. Each of the witnesses testified that Madison could not have been alert and playful around 1:30 p.m. if she had received the massive injury to the back of her head before then. Each expert believed that she would have displayed symptoms of the injury, particularly pain and discomfort. One of the emergency room doctors testified that, had the injury already occurred, Madison would have been comatose when Kolberg took her to see Laurel.

¶15. Kolberg was the only person with Madison during the period of time between the visit with Laurel and the trip to the emergency room. Kolberg asserts that he has no idea what happened to Madison except that she must have fallen from the bed to the floor, or she must have exacerbated an injury that she had previously received, or both. However, the State's witnesses testified that it was their medical opinion that it was not possible for Madison to have sustained the massive swelling of her brain from a fall from the bed. The pediatric neurosurgeon testified that if he had not known the allegations as to the cause of Madison's injuries, he would have thought she sustained them in a motor vehicle accident. He further testified that a child falling from a second story window will usually have injuries similar to Madison's. Madison had no medical conditions or diseases or preexisting injuries that any of the doctors believed would have made her more susceptible to injury.

¶16. Consequently, based on the facts and circumstances peculiar to this particular case, it is readily apparent that the State satisfied its burden of proving Kolberg's guilt beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence. Therefore, the evidence produced at trial was sufficient to support the jury's verdict of guilty. Accordingly, this assignment of error is without merit.

### II. WHETHER THE TRIAL COURT FAILED TO GUIDE THE JURY WITH ADEQUATE INSTRUCTIONS ON CRUCIAL ISSUES.

### A. Whether The Jury was Properly Instructed on the Elements of a Capital Murder Conviction and a Conviction on Manslaughter.

¶17. On Kolberg's first appeal before us he complained that he was denied the right to present the jury with a manslaughter instruction. *Kolberg I,* 704 So.2d at 1315. We agreed. Kolberg was charged with capital murder during felonious child abuse. *Id.* We relied on one of our previous decisions where we noted "...the anomaly in our murder statutes. The elements of capital murder during the course of felonious child abuse, *see* Miss. Code Ann. § 97-3-19(2)(f), are indistinguishable from the elements of felony manslaughter. *See also* Miss. Code Ann. § 97-5-39(2) (1972)." *Id.* (citing *Butler v. State*, 608 So.2d 314 (Miss. 1992)). Thus, we held:

> It is not an even-handed administration of justice in turn to deny the defense a manslaughter instruction where the accused, as is the case here, could have been lawfully indicted and prosecuted for manslaughter as easily as capital murder. And especially is this true where one verdict can bring a sentence of death and the other a maximum of twenty years imprisonment.

*Id.* at 1316 (citing *Butler*, 608 So.2d at 320). We concluded by holding that the trial court had erred in denying Kolberg the manslaughter instruction. *Id.*

¶18. At the second trial, both a murder and manslaughter instruction were given. However, Kolberg now complains that "[t]he jury could not be told that it could convict of capital murder or manslaughter, based on precisely the same elements and facts, without being given any way to distinguish between the two." Specifically, Kolberg asserts that matters were only made worse when the State proposed, and the trial court accepted, instructions which told the jury that it *must* convict of capital murder, and that it *must* convict of manslaughter based on precisely the same elements. Kolberg seeks to have this Court hold that the State must elect between charging him with simple murder, with the lesser offense of manslaughter, or charging him only with manslaughter.

¶19. Kolberg now complains of two specific jury instructions. The State's capital murder instruction (S-2), which was given by the trial court, stated:

> If you believe from all the evidence in this case, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, that the [Appellant], on or about August 24, 1988, in the First Judicial District of Hinds County, Mississippi, did wilfully, unlawfully, feloniously, with or without deliberate design, then and there, kill Madison Watson, a human being, without authority of law, when engaged in the commission of the crime of felonious child abuse and/or battery, then, if you so believe from all of the evidence, the defendant is guilty of capital murder, *and it is your sworn duty to say so by your verdict*.

The State's manslaughter instruction (S-4), which was given by the trial court, stated:

> If you believe from the evidence in this case, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence, that, [Appellant], on or about August 24, 1988, in the First Judicial District of Hinds County, Mississippi, did kill Madison Watson, a human being, without malice, by the act, procurement, or culpable negligence of [Appellant], while the said [Appellant] was engaged in the perpetration of the crime of felonious child abuse, then, if you so believe from all the evidence in this case, the defendant is guilty of manslaughter, *and it is your sworn duty to say so by your verdict*.

(emphasis added).

¶20. Kolberg's grievance seems to emanate from the language "it is your sworn duty to say so by your verdict." He argued before the trial judge to amend that portion of the instruction to read "you may find the defendant guilty of capital murder." Kolberg also complains that the error with the mandatory language was compounded by the fact that the jury was told that they must find him guilty of capital murder if they found the same elements that would support a manslaughter instruction. The State acknowledges that our decision in *Kolberg I* found these two crimes indistinguishable. However, the State submits that the consequence of our holding in *Kolberg I* was that instructions on both crimes were to be given upon remand, and that is precisely what was done. (*Id.*) The State further submits that there was nothing in *Kolberg I* or in *Butler* which would prevent the prosecution from placing both capital murder and culpable negligence manslaughter (Miss. Code Ann. § 97-3-27) before the jury. (*Id.*) Thus, the State concludes that it complied with our decision in *Kolberg I* by proceeding with both. The following reflects the arguments before the trial judge:

> MR. SMITH [for Kolberg]: Are we on six, Judge? I tell you what the difference between 6 and state's 1 is - - and this is fairly crucial in this case. In state's 1, they have the same elements of capital

murder but in the final sentence it says, "The defendant is guilty of capital murder" - - well, it's capital A murder, a typo- - "and it is your sworn duty to say so by your verdict."

The problem in this case, as the Supreme Court identified on appeal, is you've got two identical elements so you can't say you must find capital murder if you have that set of facts. You can't say you must find manslaughter either because they're both identical. So we are in an imponderable position, of course, due to the crazy state of the law, and we have noted our objection to that previously. But we certainly can't give an instruction that says, it's your sworn duty to do one thing when the instructions allow you to do either.

So that's why we amended the state's version to what's marked as defense 6 to say, "You may find the defendant guilty of capital murder." By doing that we are not waiving our objection to the inchoately insane and arbitrary and violative of the 6th, 8th, and 14th amendments and the state of the law. I just want to make that absolutely clear for anyone coming along later.

MS. LEE [for the State]: I didn't know it was decided by the Supreme Court, though, but that was - - we could go into - -

THE COURT: I am going to adopt the state's instructions. . .

*** 

MR. SMITH: We would note our objection to that, Judge, just because it is irreconcilable. It can't be their sworn duty, and we object to the sworn duty there anyhow. . .

THE COURT: All right. Objection will be overruled. . .

¶21. While the two quoted instructions above might alone be confusingly similar, the record reflects that the jury was given yet another instruction to aid them in considering the issue of culpable negligence manslaughter. It reads:

The Court instructs the jury that the killing of a human being by the act, procurement, or culpable negligence of another, without authority of law, is manslaughter, and the Court further instructs the jury that culpable negligence is defined as negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life.

If you believe from the evidence beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, that the death of Madison Watson was caused by the act, procurement or culpable negligence of Bryan Kolberg, then you may find the defendant guilty of the crime of manslaughter.

We are satisfied that this instruction more than adequately defines manslaughter and culpable negligence to the degree that any perceived confusion which even possibly could have been caused by the two instructions of which Kolberg now complains would be rendered virtually impossible. "Jury instructions are not to be read unto themselves, but with the jury charge as a whole." *Edwards v. State*, 737 So.2d 275, 316 (Miss. 1999) (citing *Carr v. State*, 655 So.2d 824, 848 (Miss. 1995)). "[D]efects in specific instructions do not require reversal 'where all instructions taken as a whole fairly - - although not perfectly -

- announce the applicable primary rules of law."' **Wallace v. Thornton**, 672 So.2d 724, 729 (Miss. 1996); **Rawson v. Midsouth Rail Corp.**, 738 So.2d 280, 290 (Miss. Ct. App. 1999). Although Kolberg argues that the jury was given no way to distinguish between capital murder and manslaughter, it is clear from the record that the jury instructions, taken as a whole and read together, clearly distinguished between the crimes of capital murder and culpable negligence manslaughter. Consequently, this assignment of error is without merit.

### B. Whether the Trial Court's Failure to Instruct the Jury on the Underlying Felony of Child Abuse was Reversible Error.

¶22. There was no jury instruction given that defined "child abuse," i.e., the underlying felony for Kolberg's capital murder charge. The State concedes as much in its brief when it states that "there is no avoiding the fact that the jury [was] never instructed with the elements of the crime of felonious child abuse." Kolberg argues that this is reversible error, understandably asserting that this omission violates the law we espoused in **Hunter v. State**, 684 So.2d 625 (Miss. 1996) and its progeny.

¶23. There is no doubt that the trial court is ultimately responsible for rendering proper guidance to the jury via appropriately given jury instructions, even sua sponte. *See* **Smith v. State**, 656 So.2d 95, 99-100 (Miss. 1995)(concerning sua sponte limiting/cautionary instruction in a case involving possession with intent to distribute drugs). *See also* **Manuel v. State**, 667 So.2d 590, 593 (Miss. 1995)(citing **Hester v. State**, 602 So.2d 869, 873 (Miss. 1992)); **Murphy v. State**, 566 So.2d 1201,1207 (Miss. 1990); and, **Sayles v. State**, 552 So.2d 1383, 1390 (Miss. 1989). On the other hand, it is interesting to note here that, while by no means dispositive of this particular issue, neither Kolberg nor the State, through counsel, brought this critical oversight to the attention of the trial court during the jury instruction conference. Additionally, when Kolberg filed his motion for a new trial (which also incorporated a request for a judgment notwithstanding the verdict), he assigned twenty-one (21) grounds for a new trial, yet did not mention this critical issue of a failure to instruct the jury in a capital murder case on the underlying felony. The only mention in the motion for a new trial concerning a complaint as to jury instructions was when Kolberg, through counsel, asserts: "The instructions were incomplete and fatally misstated the law *as set out in the defense objections made at the time*, and the jury was permitted to make an entirely arbitrary decision between capital murder and felony manslaughter, without any rational way to distinguish between the two. Bryan Kolberg reiterates all of the objections he made during the charge conference." (emphasis added). It is obvious, for two reasons, that this assignment of error number 17 found in Kolberg's motion for a new trial pertains to the capital murder- manslaughter issue. First of all, this assignment specifically addresses the capital murder and manslaughter instructions, and, secondly, the "defense objections made at the time" reference certainly could not pertain to the underlying felony issue, because no objection nor inquiry was made during the jury instruction conference as to the failure to give an instruction on the underlying felony.

¶24. The underlying felony instruction issue came to light when the State, in its response to Kolberg's motion for a new trial, brought this issue to the trial court's attention via this language: "Although not addressed by counsel during trial, or in his motion for a new trial, the jury was not instructed at the guilt phase on the underlying felony of child abuse. This is brought to the Court's attention because at least one Supreme Court opinion has suggested that failure to instruct a jury on the underlying felony of a capital murder case is fundamental error. **Hunter v. State**, 684 So.2d 625, 636 (Miss. 1996)." Kolberg responds by stating that he preserved this issue for the trial court, and now for appeal, when he objected on the basis that the State's instructions were "incomplete."

¶25. In its order denying Kolberg's motion for a new trial, the trial court, inter alia, understandably opines that Kolberg's incompleteness objection to jury instructions gave the trial court " 'not the foggiest' as to what error or omission the Defendant is referring and certainly not specific enough to preserve the issue. *See Morgan v. State*, 741 So.2d 246 (Miss. 1999). If the Defendant knew this was his objection then he was required to so state." Notwithstanding these statements from the trial court, it went on to rule on the merits concerning the issue of failure to instruct the jury on the underlying felony, and found that the jury was fully and properly instructed and that no error requiring the grant of a new trial was committed.

¶26. However, because the trial court is responsible for assuring that the jury is fully and properly instructed on all issues of law relevant to the case, because there can be no doubt that error was committed in failing to instruct the jury on the underlying felony, and because of the current status of the law in this State on this crucial issue, we address, on the merits, the issue of whether the trial court's failure to instruct the jury in this capital murder case on the underlying felony of child abuse was reversible error.

¶27. We begin our discussion with a review of three cases critical to this issue, namely, ***Ballenger v. State***, 761 So.2d 214 (Miss. 2000); ***Shaffer v. State***, 740 So.2d 273 (Miss. 1998); and, ***Hunter v. State***, 684 So.2d 625 (Miss. 1996).

¶28. In chronological order, starting with the earliest case, we look at ***Hunter***, which was a capital murder case. The defendant was convicted of murdering the victim during the commission of a robbery. Hunter argued before us that reversal of his conviction and death sentence was required because the jury had received no instruction for the underlying robbery. We held that *the State* had a duty to ensure that the jury was properly instructed on the underlying crime. ***Id.*** at 635. We stated:

> It is hornbook criminal law that before a conviction may stand the State must prove each element of the offense. Not only is this a requirement of the law of this State, due process requires that the State prove each element of the offense beyond a reasonable doubt. ***Neal v. State***, 451 So.2d 743, 757 (Miss. 1984). A logical corollary of this principle is that, because the State has to prove each element of the crime beyond a reasonable doubt, then the State also has to ensure that the jury is properly instructed with regard to the elements of the crime. *See also **Hosford v. State***, 525 So.2d 789, 792 (Miss. 1988)(quoting ***Adams v. State***, 202 Miss. 68, 75, 30 So.2d 593 (Miss. 1947)("In conducting a criminal case, the prosecuting attorney must be fair and impartial, **and see that defendant is not deprived of any constitutional or statutory right**.")(emphasis in original).

*Hunter*, 684 So.2d at 635. We went on to state:

> Just as the State must prove each element of the offense, the jury must be correctly and fully instructed regarding each element of the offense charged. ***Neal***, 451 So.2d at 757 n. 9. *Failure to submit to the jury the essential elements of the crime is "fundamental" error. **Screws v. United States***, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945) (emphasis added). In capital murder cases, the trial court is "required to instruct just as fully regarding the definition of [the underlying crime] as it [is] on murder." ***Id.*** Indeed, "[i]t is axiomatic that a jury's verdict may not stand upon uncontradicted fact alone. The fact must be found via jury instructions correctly identifying the elements of the offense under the proper standards." "Where the jury had incorrect or incomplete instructions regarding the law, our review task is nigh unto impossible and reversal is generally required."

> *Henderson v. State*, 660 So.2d 220, 222 (Miss. 1995); *Neal v. State*, 451 So.2d 743, 757 n. 9 (Miss. 1984); *see also Watson v. State*, 465 So.2d 1025, 1031 (Miss. 1985).

*Hunter*, 684 So.2d at 636. Kolberg asserts that under the rules annunciated in *Hunter*, harmless error analysis cannot apply. He tells us instead, that this error is "fundamental" and that automatic reversal is required.

¶29. Almost two years after *Hunter*, we decided *Shaffer v. State*, 740 So.2d 273 (Miss. 1998). The defendant in *Shaffer* was charged with capital murder - - murder in the course of sexual battery. *Id.* at 279. The original instructions given to the jury allowed them to find Shaffer guilty of capital murder, simple murder, manslaughter, or not guilty. *Id.* There was no instruction for sexual battery. *Id.* The jury sent a note to the trial judge inquiring about the role sexual battery would play in their verdict. *Id.* Subsequently, the trial judge sent the jury a new verdict form which gave the jury the original options, as well as including murder and sexual battery, and manslaughter and sexual battery. *Id.* The jury returned a guilty verdict of murder and sexual battery. *Id.*

¶30. The jury instruction on murder omitted the element of "evincing a depraved heart, regardless of human life," which is an element of murder pursuant to Miss. Code Ann. § 97-3-19(1)(b). Although Shaffer objected to the instruction on a different ground at trial, we held that he was not precluded from raising a new objection to the instruction before us. *Id.* at 282. We said that "[i]nstructing the jury on every element of the charged crime is so basic to our system of justice that it should be enforced by reversal in every case where inadequate instructions are given, regardless of a failure to object or making a different objection at trial."*Id.* We then relied heavily on our decision in *Hunter*, labeling the omission "fundamental." *Id.*

¶31. We also reiterated the rule from *Davis v. State*, 586 So.2d 817, 819 (Miss. 1991) that "[a] conviction is not valid where the prosecution does not prove each element of the charged offense beyond a reasonable doubt." *Id.* The logical corollary of this, we said, was that if the jury does not find the defendant guilty of each element of the offense, a conviction may not stand. *Id.* We concluded by saying "[w]here the jury is not even instructed on one of the vital elements of the offense, the conviction must not survive the scrutiny of this Court." *Id.*

¶32. Only two years after *Shaffer*, we handed down *Ballenger v. State*, 761 So.2d 214 (Miss. 2000). *Ballenger* came before this Court as a motion for post-conviction relief. Ballenger's direct appeal was before us prior to our decisions in *Hunter* and *Shaffer*. *See Ballenger v. State*, 667 So.2d 1242, 1252 (Miss. 1995). On direct appeal, we rejected Ballenger's argument that the failure to include an instruction on the underlying felony of robbery was fundamental. *Ballenger II*, 761 So.2d at 216. Ballenger's assertion in her motion for post-conviction relief alleged this omission was a violation of both state and federal constitutional law. *Id.* We examined her claim in light of the intervening decisions in *Hunter* and *Shaffer*. This time, we agreed with Ballenger. In a 5-4 decision, we held that those two decisions required an "*automatic reversal*," and granted her motion. *Id.* at 219-20 (emphasis added).

¶33. We deem it appropriate to now at least revisit our decisions in *Hunter*, *Shaffer*, and *Ballenger* as they relate to "automatic reversal" for failure to give a jury instruction on the underlying felony in a capital murder prosecution under the provisions of Miss. Code Ann. § 97-3-19(2)(e)(f).

¶34. In *Carleton v. State,* 425 So.2d 1036, 1040 (Miss. 1983) this Court held that "each case must stand on its own facts in determining whether a particular error constitutes reversible error." In *Forrest v. State*,

335 So. 2d 900, 903 (Miss. 1976), this Court held that "an error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty." (citing Rule 11, Miss. Sup. Ct. Rules (1976), ***Kuhn v. State***, 324 So.2d 744 (Miss. 1976), ***Dixon v. State***, 306 So.2d 302 (Miss. 1975)).

¶35. ***Conley v. State***, 790 So.2d 773, 793 (Miss. 2001) is similar to this case. ***Conley*** was a capital murder case in which the trial court refused a manslaughter instruction which correctly defined "culpable negligence." Instead, it allowed an instruction which did not fully define "culpable negligence." Justice Mills, writing for this Court, held that the error was harmless:

> The error did not contribute to the verdict as the jury unanimously agreed that (appellant) murdered (victim) while engaged in the crime of kidnapping. Error is harmless if it is clear beyond a reasonable doubt that it did not contribute to the verdict (citing ***Chapman v. California***, 386 U.S. 28, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967.) Therefore, although the trial court may have erred in refusing to grant (Appellant's) manslaughter instruction containing an adequate definition of culpable negligence, it was harmless error.

¶36. Even back in 1941, this Court was recognizing the principle discussed by the ***Conley*** court. In ***Lancaster v. State***, 200 So. 721, 722 (Miss. 1941), this Court stated that errors were harmless where "the same result would have been reached had they not existed."

¶37. We opined in ***Lentz v. State***, 604 So. 2d 243, 249 (Miss. 1992), that "[e]ven where error has occurred, we will not reverse a conviction when the overwhelming weight of the evidence supports the guilty verdict." (citing ***Holland v. State***, 587 So.2d 848, 865 (Miss. 1991); ***Whitley v. State***, 511 So.2d 929, 931 (Miss. 1987); ***Griffin v. State***, 504 So.2d 186, 190 (Miss. 1987); ***Giles v. State***, 501 So.2d 406, 408 (Miss. 1987)).

¶38. Even in ***Hunter***, we stated that "[i]ndeed, an instructional error will not warrant reversal if the jury was fully and fairly instructed by other instructions." ***Hunter v. State***, 684 So.2d at 635, citing ***Collins v. State***, 594 So.2d 29, 35 (Miss. 1992); ***Heidel v. State***, 587 So.2d 835, 842 (Miss. 1992), Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1990).

¶39. The language of ***Screws v. United States***, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945), is instructive as to this particular issue, despite ***Hunter***'s negative citation of it. The ***Screws*** Court stated that "...where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion." Here in Kolberg's case, the essential ingredients have been submitted and conviction has been obtained on the charge of capital murder. Instruction No. S-2, which was given by the trial court, stated:

> If you believe from all the evidence in this case, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis consistent with innocence, that the defendant, Brian Joseph Kolberg, on or about August 24, 1988, in the First Judicial District of Hinds County, Mississippi, did wilfully, unlawfully, feloniously, with or without deliberate design, then and there, kill Madison Watson, a human being, without authority of law, ***when engaged in the commission of the crime of felonious child abuse and/or battery***, then, if you so believe from all the evidence, the defendant is guilty of capital murder, and it is your sworn duty to say so by your verdict.

(emphasis added). Miss. Code Ann. § 97-3-19(2)(f) provides:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>
> ***
>
> (f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony;"

Miss. Code Ann. § 97-5-39(2) states:

> Any person who shall intentionally (a) burn any child, (b) torture any child, or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child....

In comparing Instruction No. S-2, with Miss. Code Ann. § 97-3-19(2)(f) and Miss. Code Ann. § 97-5-39(2)(c), there is no doubt that the jury was fully and fairly instructed as to all the elements of capital murder with the underlying felony of child abuse. Instruction No. S-2 informed the jury that in order to find Kolberg guilty of capital murder, the jury had to find, inter alia, that the killing of Madison Watson was committed by Kolberg while he was "engaged in the commission of the crime of felonious child abuse and/or battery." The jury was informed in other instructions that before it could find Kolberg guilty, the State must prove each element of the crime beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence. We must consider a United States Supreme Court case which was handed down after our decisions in *Hunter* and *Shaffer*, but admittedly prior to our decision in *Ballenger II*, namely, *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). However, Kolberg argues that we handed down *Ballenger* one year after the United States Supreme Court handed down *Neder*. Therefore, he says that we were well aware of this holding. However, there is no mention of *Neder* either in the majority or the dissent. Yet, in *Ballenger*, we did cite to the United States Supreme Court's decision in *Screws v. United States*, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945) for the proposition that the "[f]ailure to submit to the jury the essential elements of the crime is 'fundamental' error." *Ballenger*, 761 So.2d at 217. Thus, our decision was grounded, at least in part, on federal interpretation; therefore, we now consider the high court's decision in *Neder*. In *Neder*, the defendant was found guilty by the jury despite a jury instruction which left out one element of the charged offense. The *Neder* Court ruled that omission of the element did not render the trial "fundamentally unfair," and did not warrant reversal of the conviction: "We have often applied harmless-error analysis to cases involving improper instructions on a single element of the offense." 527 U.S. at 9-10 (citing *Yates v. Evatt*, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989); *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed. 2d 439 (1987)). The Court in *Neder* continued by stating:

> Having concluded that the omission of an element is an error that is subject to harmless-error analysis, the question remains whether Neder's conviction can stand because the error was harmless. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we set forth the test for determining whether a constitutional error is harmless. That test, we said, is whether it appears

"beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."*Id.,* at 24, 87 S.Ct. 824; *see Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt").

527 U.S. at 15-16.

¶40. After mature consideration and consistent with the foregoing authority, both from this Court and the United States Supreme Court, including ***Conley***, we apply a harmless error analysis in this case where the trial court failed to instruct the jury on the underlying felony in this capital murder prosecution. However, we implore the trial courts to be alert to the need to assure that the jury is adequately instructed on the underlying felony in a capital murder trial. We also acknowledge that our decisions in many cases are "fact-driven" thereby meaning that, even in applying a "harmless error analysis", had the facts in this case been different, the result here certainly could have been different. We make this statement as a caveat in future capital murder prosecutions under the provisions of Miss. Code Ann. § 97-3-19(2)(e)-(f), that should the trial court fail to instruct the jury on the underlying felony, even in applying a "harmless error analysis," this Court may still be compelled, based on the facts and/or the particular underlying felony, to find such failure to be reversible error.

¶41. In applying "harmless error" analysis here, the Court notes that there is overwhelming circumstantial evidence pointing to Kolberg's guilt. Doctors have testified that the type wounds young Madison received are consistent with those received in an automobile accident or falling from the second or third story of a building. Kolberg took Madison to see her mother at work around 1:00 p.m. on the day she ended up in the emergency room around 4:00 p.m. Experts have testified that Madison could not have been alert at 1:00 p.m. when she saw her mother if the head trauma had already been inflicted, meaning that the head trauma had to have occurred after that. Moreover, Kolberg was the only person with Madison in between the visit with her mother and the trip to the emergency room. Kolberg, however, maintains that he has no idea what happened to Madison to cause her massive head trauma. Madison had no medical conditions or preexisting injuries.

¶42. The only law that the jury did not receive via jury instructions was the language found in Miss. Code Ann. § 97-5-39(2)(c), which would have informed the jury that felonious child abuse meant an intentional whipping, striking or otherwise abusing or mutilating of any child "in such a manner as to cause serious bodily harm." There is absolutely no way that this lack of information on the part of the jury affected the outcome of this case. Kolberg claims that while Madison had serious injuries, he was not the one who inflicted the injuries. By their verdict of guilty, the jury was satisfied that the State had proven beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that Kolberg "did wilfully, unlawfully, feloniously, with or without deliberate design, then and there kill Madison Watson, a human being, without authority of law", which necessarily meant that based on the evidence before the jury, Kolberg was the one who inflicted these massive head injuries upon Madison. The evidence revealed that the head trauma which caused young Madison's death was so severe that no reasonable juror, upon finding that Kolberg killed Madison within a three-hour period, could have made any finding other than that the injuries were intentionally inflicted upon Madison "in such a manner as to cause serious bodily harm."

¶43. As previously stated, a trial court's instructions to the jury "are not to be read unto themselves, but with the jury charge as a whole." **Edwards**, 737 So. 2d at 316. Without doubt, when the jury considered the overwhelming evidence of Kolberg's guilt, and applied that evidence to the law pronounced in the jury instructions given by the trial court, including, but not limited to, Instruction S-2 on the elements of the crime of capital murder, which, *inter alia*, informed the jury that the killing had to occur while Kolberg was "engaged in the commission of the crime of felonious child abuse and/or battery," the error in failing to instruct the jury on the underlying felony of child abuse was harmless error because "it is clear beyond a reasonable doubt that it did not contribute to the verdict." **Conley**, 790 So.2d at 793. Accordingly, applying harmless error analysis to the facts of this case, Kolberg's assignment of error concerning the trial court's failure to instruct the jury by way of defining the underlying felony of child abuse in this capital murder prosecution is without merit.

### C. Whether the Jury Should Have Been Given an Instruction on the Defense Theory of the Case.

¶44. Kolberg next tells us that he requested an instruction which would have stated his theory of the case, but that the instruction was improperly denied. Jury Instruction No. 11 which Kolberg requested reads as follows:

> The Court instructs the jury that it is the defense theory of the case that Madison Watson suffered a brain injury on August 12, 1988, while in the care and custody of her aunt Lisa Watson. That Madison sustained a second brain injury in a fall from the bed on August 19, 1988. This fall, in part because of the established brain injury, resulted in the catastrophic brain injury that led to her death. The defense is not required to prove this theory but rather the State of Mississippi is required to disprove this theory and prove its case beyond a reasonable doubt and to exclusion [sic] of every other reasonable hypothesis except that of guilt.

¶45. The State responds that:

> [i]n a homicide case, as in other criminal cases, the court should instruct the jury as to theories and grounds of defense, justification, or excuse supported by the evidence, and a failure to do so is error requiring reversal of a judgment of conviction. Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court. Where a defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error.

(quoting **Giles v. State**, 650 So.2d 846, 849 (Miss. 1995)). We agree with the State's assertion that this instruction contained no instruction of law except identifying the State's burden of proof. The State's burden of proof was contained within other jury instructions. Since this proffered jury instruction did not instruct upon the principles of a defense beyond a general denial of the allegations in the indictment, the given Jury Instruction No. 14 was sufficient. Jury Instruction No. 14 stated: "If there is a reasonable hypothesis under which the death was due to causes which were either accidental or due to actions not caused directly by the defendant, the occurrence is one for which the defendant is not liable." This instruction sufficiently comported with Kolberg's entire theory of the case and evidence he presented at trial. Accordingly, this assignment of error is without merit.

## III. WHETHER THE STATE IMPROPERLY PRESENTED EVIDENCE OF ALLEGED SEXUAL ABUSE.

¶46. Kolberg's next assignment of error revolves around testimony elicited from Dr. Paul Rice, one of the State's expert witnesses. When Madison was first examined in the emergency room, emergency doctors noticed abrasions on Madison's vagina, and a hymenal tear. The doctors requested that Dr. Rice, an OB/GYN, examine her. Dr. Rice observed multiple old abrasions at the introitus, the opening of the vagina, as well as an old scar along the introitus at approximately the seven o'clock position indicating a hymenal tear. It was opined that the vaginal abrasions were about one or two weeks old.

¶47. Kolberg filed a motion to prevent the State from making any allegations of sexual abuse. At the conclusion of the hearing on this motion, the trial judge ruled that the State would be prohibited from making any allegations of sexual abuse, but that evidence of the abrasions, but not the scar, would be admissible at trial if the State could lay a proper foundation establishing its relevance. A prerequisite of this ruling, however, was that if the State sought to have the abrasion testimony admitted, such request would have to be made to the trial court outside the presence of the jury. Although counsel for Kolberg attempted to have the trial judge rule conclusively whether he would allow the abrasion testimony at trial, the trial judge declined to do so pre-trial, stating that he would issue a definitive ruling at trial, in the context of the foundation which had been laid in order for him to determine if the abrasion testimony was in fact relevant.

### A.

¶48. Kolberg asserts that the State committed a discovery violation by virtue of Dr. Rice's testimony. Specifically, Kolberg complains that Dr. Rice testified that the abrasions were inflicted "intentionally," and that the State failed to disclose that he would offer such testimony. Kolberg objected at trial to "a massive discovery violation" and now argues that reversible error was committed when the trial judge overruled his objection "without even following the first *Box* step." *See Box v. State*, 437 So.2d 19, 23-26 (Miss. 1983). The *Box* criteria are now reflected in Uniform Circuit and County Court Rule 9.04 I. The pertinent portion of that section reads as follows:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
>
> 2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
>
> 3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

¶49. Thus, Kolberg asserts that the trial judge should have granted a continuance in accordance with this rule. However, the State maintains this rule was simply not applicable because no discovery violation occurred. Kolberg's ground for claiming this alleged discovery violation is that Dr. Rice never stated that the

abrasions "were evidence of intentional acts on anybody's part."

¶50. While Kolberg claims that he received no notice prior to trial that Dr. Rice would say the abrasions were non-accidental, we disagree. In a footnote in his brief before us, Kolberg tells us "[a]s a precaution, when it seemed the State might change horses on this issue, the defense filed a *Motion to Bar any Discussion of Alleged Sexual Abuse of the Child*." This motion was partially the reason for a pre-trial hearing, and at the onset of the hearing, the State informed the trial judge that it had one witness present in response to this motion. Kolberg focuses on the State's assertion that it was "not intending to get into any evidence of alleged sexual abuse." However, the State went on to say:

> This is only - - the only thing - - I told Mr. Stafford Smith that the only intention I had was to bring in the injuries that Madison had at the time she was admitted to the hospital, and that includes the bruises and abrasions in her vaginal area that were present on the day that she was admitted to the hospital. *And case law is clear in Mississippi that as long as we are using it in rebuttal style purposes to negate the fact that this was an accident, which that is the theory that Mr. Kohlberg [sic] has espoused from the very beginning, it was an accident, that as long as we are using these injuries to negate the fact that it was an accident that we are entitled to use that.*

(emphasis added). Kolberg consistently argued that Dr. Rice's testimony was irrelevant due to the inability to *date* the injuries. Kolberg insisted that Dr. Rice be called to the stand to be questioned at this pre-trial hearing, whereupon the State, at the insistence of Kolberg's counsel, called Dr. Rice to the stand at the pre-trial motion hearing. During this pre-trial hearing, the following exchange occurred between Dr. Rice and the State:

> Q. Dr. Rice, you can't say if this child was sexually abused or not; can you?
>
> A. No, I can't.
>
> Q. But there was - - I believe in your impressions in your report you did put as one of your impressions possible sexual abuse; correct?
>
> A. Well, possible vaginal trauma.

On redirect examination, the following exchange occurred between the State's attorney and Dr. Rice:

> Q. Dr. Rice, with a 22-month-old baby girl what you observed in her vaginal area, is that what you would consider a normal finding of a 22-month-old child with vaginal tears and torn hymen and abrasions in that area?
>
> A. The abrasions may have been - - could have been there, but the torn hymen that's unusual.
>
> Q. Especially, coupled with the fact that she was in a coma from being beaten to death?
>
> A. Yes, ma'am.
>
> Q. So that would be unusual finding (sic)?
>
> A. Yes.

Finally, the State emphasized after the conclusion of Dr. Rice's testimony that:

> We would just reiterate in the case law of *Houston* and *Aldridge* case that the *evidence of prior abuse may be received to negate the idea that the injuries were the result of a fall or isolated incident*. And, of course, that is why all the other bruises came in. And I am not trying to get in the hymenal tear or the scar. I understand that that - - we cannot date it but the abrasions are within that time period that Bryan Kolberg was there at the home.

¶51. Accordingly, based on the above-quoted testimony, it is clear that Kolberg cannot claim he was surprised by Dr. Rice's testimony at trial that he believed Madison's injuries were non-accidental. Thus, we agree that the *Box* factors did not apply here. This assignment of error is without merit.

### B.[(2)]

¶52. Kolberg next asserts the trial court committed reversible error when it allowed evidence of the abrasions to be admitted at trial. Essentially, this asks us to pass on the admissibility of the evidence. "The admissibility of evidence rests within the discretion of the trial court." *Gleeton v. State*, 716 So.2d 1083, 1089 (Miss. 1998). This Court will only reverse if the trial court has abused its discretion. *Id.*

¶53. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Miss. R. Evid. 401. Kolberg asserts that any evidence of the abrasions was not relevant of anything. The State tells us "the evidence of prior abuse may be received to negate the idea that the injuries were the result of a fall or isolated incident. And, of course, that is why all the other bruises came in." Additionally, the State asserts that since the abrasions were one or two weeks old, they would have occurred at a time when Kolberg was in the home with Madison and Laurel. Further, the State says if the injuries were self-inflicted or accidental, they would not have been relevant. Miss. R. Evid. 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, *or absence of mistake or accident*.

(emphasis added). Miss. R. Evid. 403 provides that relevant evidence may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....." The State argued at the pretrial hearing that it would attempt to introduce the testimony to rebut Kolberg's claim that Madison's injuries were accidental. The trial court determined that it would consider allowing evidence of the vaginal abrasions but not of the hymenal tear.

¶54. The following dialogue at trial between the State and Dr. Rice on redirect examination serves as the basis for Kolberg's assertion that the error of admitting the alleged irrelevant abrasion testimony was further compounded throughout the trial:

> Q. Dr. Rice, let me ask you a question. Do you know who caused the vaginal trauma to Madison Watson?
>
> A. No, I don't.

Q. But you have stated that this was nonaccidental trauma to her vagina; is that correct?

A. In my opinion, yes.

Q. Okay. Let me ask you: Would this be consistent with a vulvar intercourse?

A. In my experience in examining children that have participated in vulvar intercourse, you would see superficial abrasions.

Q. Okay. And can you - -

MR. SMITH: Your Honor, I object to that.

THE COURT: Sustain objection.

Q. Mr. Smith had asked you what this could have been caused by. Could it have been caused by someone using their finger to rub against the child's vagina?

Counsel for Kolberg again objected, and his objections were again sustained. The State asserts counsel for Kolberg opened the door by asking how the abrasions might have been caused.

¶55. During Kolberg's cross-examination of Dr. Rice, he sought to establish that it would be pure speculation for anyone to say how the abrasions came to be on Madison's body. Kolberg's counsel quoted Dr. Rice's testimony from the pre-trial hearing where Dr. Rice had said: "I don't know if changing a diaper could cause a superficial abrasion, or I don't know if the child had been manipulated prior to coming to the hospital, or if she had been examined in the emergency room prior to my being called down." Apparently, counsel for Kolberg was offended by the State's earlier question that was predicated on the statements of Kolberg's counsel in opening statements that the abrasions could have been caused by a diaper rash. For, after quoting Dr. Rice's testimony from the pretrial hearing, counsel for Kolberg then stated: "So it was you [Dr. Rice] who suggested that, in fact, rubbing from the diaper could cause a tiny abrasion like this. Is that fair to say?" Dr. Rice answered "yes" but was cut off by defense counsel from completing his answer and disputed defense counsel's allegation that he [Dr. Rice], had said that such an abrasion was a normal finding in a 22-month old baby.

¶56. We conclude without doubt that this line of questioning by defense counsel opened the door for the State's "vulvar intercourse" questioning on redirect examination. We have previously said that "[i]f a defendant opens the door to line of testimony, ordinarily he may not complain about the prosecutor's decision to accept the benevolent invitation to cross the threshold." *Randall v. State*, 806 So.2d 185, 198 (Miss. 2001) (citing *Doby v. State*, 557 So.2d 533, 539 (Miss. 1990)). *See also Reddix v. State*, 381 So.2d 999, 1009 (Miss. 1980) ("If the defendant goes fishing in the state's waters, he must take such fish as he catches.").

¶57. Notwithstanding our finding here that Kolberg opened the door to this line of questioning on redirect examination, we note here that while allowing evidence as to the vaginal abrasions discovered by the medical personnel at the hospital as they struggled to save Madison's life, the trial court consistently ruled that no evidence concerning sexual abuse would be allowed, and when the prosecutor attempted to question a witness about "vulvar intercourse" on redirect examination, the trial court promptly sustained the objection. Additionally, the trial court cautioned the jury as to this evidence. The trial court had a

conference with the attorneys outside the presence of the jury, and then once the jury was put back in the box, the trial court instructed the jury, inter alia:

> [T]here has been some evidence placed before the jury that might indicate there is an effort to establish a sexual abuse, and the Court would instruct you that that is not an issue for you to consider; that sexual abuse is not an allegation charged against the defendant, and you are not to consider that in your deliberations.

¶58. In *Davis v. State*, 377 So.2d 1076, 1079 (Miss. 1979), this Court wrote "(giving a cautionary instruction) regarding the prohibition against using prior convictions as substantive evidence of guilt of the cardinal charge, the proof falls outside of the 'forbidden inferential sequence'" and does not constitute reversible error.

¶59. In *Pugh v. State*, 584 So.2d 781 (Miss. 1991), the defendant argued successfully that it was reversible error for the trial judge <u>not</u> to have entered a cautionary instruction regarding admission of prior convictions. "In (a) situation where no cautionary instruction is given to the jury, prejudicial error has intervened."*Id.*, 584 So.2d at 786 (quoting *United States v. Diaz,* 585 F.2d 116 (5th Cir. 1978)).

¶60. In *Baldwin v. State*, 784 So. 2d 148 (Miss. 2001), the trial judge did not allow the state to introduce evidence of the defendant's prior convictions. Instead, the trial court sustained the defendant's objections and heard his motion for a mistrial, which he overruled. The trial judge admonished the jury to disregard the impermissible testimony and this Court ruled that the judge's "curative efforts" prevented prejudicial error.

¶61. In *Williams v. State*, 445 So.2d 798 (Miss. 1984), which was a capital murder case, this Court held that a jury is presumed to have followed the judge's curative admonitions to a jury. *Evans v. State*, 422 So.2d 737, 744 (Miss. 1982), also a capital murder case, held that "[t]he jury is presumed to have followed the directions of the judge."

¶62. In the end, we find on the record before us that the abrasion evidence was properly admitted under Miss. R. Evid. 403 and 404(b); and that any error which may have occurred regarding alleged sexual abuse was cured by the trial judge's cautionary instruction. Accordingly, this assignment of error is without merit.

### IV. WHETHER EVIDENCE OF KOLBERG'S ALLEGED PRIOR "BAD ACTS" WAS ADMITTED IN VIOLATION OF MISS. R. EVID. 404(B).

¶63. Kolberg next complains that evidence of prior instances of injuries sustained by Madison when she was in his care and control were improperly admitted under Miss. R. Evid. 404(b) because the prior bad act must be affirmatively proven to have been committed by the accused. The testimony giving rise to this objection is that of Madison's mother, Laurel, who testified, inter alia, that prior to Kolberg moving into her home, she did not notice bruises, scrapes, bumps or knots on Madison's face. She further stated that Madison was not a clumsy child; however, Laurel said that once Kolberg moved into her home, Madison began to have unexplained bruises on her face, eye, nose, and a bruise behind one of her ears.

### A. Whether the "Bad Acts" Testimony Was Alleged with Sufficient Specificity, or Whether the State Produced Any Actual Evidence in Support Thereof.

1.

¶64. As stated above, Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶65. Kolberg now argues Laurel's testimony was improperly admitted under Rule 404(b) because, he asserts, the evidence only proved that Madison fell and got scraped twice. Kolberg relies on *Cardwell v. State*, 461 So2d 754 (Miss. 1984), *Darby v. State*, 538 So.2d 1168 (Miss. 1989), and *United States v. Beachum*, 582 F.2d 898 (5th Cir. 1978), to support his argument that prior to admitting the prior acts of child abuse by a defendant the prosecution must first affirmatively prove the defendant actually committed the prior offense. Kolberg further alleges that the only evidence in this case was that offered by himself, which evidence revealed only accidental injuries suffered by Madison. Accordingly, Kolberg concludes this evidence was improperly before the jury.

¶66. In *Johnson v. State*, 475 So.2d 1136 (Miss. 1985), we were confronted with an appeal by a mother who was convicted of killing her infant child. She raised, as one point of error, the admission of testimony regarding old injuries which did not cause the child's death and she claimed might not have been attributable to her. *Id.* at 1142. We referred to our previous decision in *Cardwell* and said:

> The [*Cardwell*] Court cited *Aldridge v. State*, 398 So.2d 1308 (Miss. 1981), which was a child abuse case where there was testimony and x-rays by medical experts concerning injuries of the child which tended to establish previous abuse. The Court noted that in *Aldridge* it was held that evidence of prior acts was admissible in a felonious child abuse case to "negate the idea that the injuries resulted from an isolated accident." The *Cardwell* Court concluded that such evidence was "likewise admissible where death results and the prosecution is one for murder. *Id.* at 759, 760 (citations omitted). The Court did point out that the admissibility is "subject to proof demonstrating that the defendant committed the prior offense." *Id.* at 760. One of the cases cited for this proposition is *United States v. Colvin*, 614 F.2d 44 (5th Cir. 1980). In that case, the Fifth Circuit Court of Appeals said that such proof was a "predicate to the determination that the extrinsic evidence is relevant." 614 F.2d at 45. *That court went on to determine that a sufficient predicate had been laid in light of the evidence that showed the appellant was in exclusive control of the children prior to the time the injuries occurred and in light of the expert medical testimony contradicting her version of accidental causes.*

*Johnson*, 475 So.2d at 1143 (emphasis added).

¶67. This is precisely what happened in the present case. Kolberg's theory was that he had no idea what happened to Madison. He tried to convince the jury that it must have been an accident. The State introduced evidence of unexplained bruises that appeared on Madison's body when she was in the exclusive control of Kolberg. According to Laurel's testimony, Madison never had unexplained bruises prior to the time Kolberg lived in the home with them. Accordingly, this evidence was properly admitted under Miss. R. Evid. 404(b) and Miss. R. Evid. 403, and this assignment of error is therefore without merit.

¶68. Kolberg next asserts that the State only introduced Laurel's testimony in an effort to show that he was in the habit of abusing children. He claims that the State simply took a laundry list approach, and merely recited the entire statute as the ground to introduce the evidence under Rule 404(b). Essentially, he claims the State never identified what this evidence was relevant to prove, and argues that this evidence cannot be used to establish intent because intent is not an element of the offense. As an initial matter, the State *did* say during the pretrial hearing on Kolberg's motion that it was using the evidence for rebuttal purposes.

¶69. Kolberg relies heavily on our decision in *Houston v. State*, 531 So.2d 598 (Miss. 1988).[(3)] In *Houston*, the defendant was convicted of the capital murder of her 14 year-old daughter while engaged in the crime of felonious child abuse and battery. She argued before us that the prior instances of abuse which were admitted into evidence against her were admitted erroneously. *Id.* at 602. We agreed. We considered her arguments in the context of relevancy. *Id.* We held that it was not relevant in her case because it was admitted to establish "intent" or "malice aforethought," and the jury was instructed accordingly *Id.* at 605 n.3, 606. We held that the prior instances of abuse did not assist in establishing the defendant's intent under those particular facts, and consequently, were not relevant. *Id.* at 608.

¶70. However, *Houston* recognized that this Court's prior cases, including *Johnson* and *Aldridge*, had suggested "that such evidence becomes relevant in rebuttal after the defendant has sought to show or infer that the injuries sustained by the child were accidental or the result of an isolated incident." *Id.* at 606. We also noted that while our cases had recognized this principle, we had never held that is was absolutely necessary for the prosecution to prevail. *Id.* While still considering prior abuse evidence in the context of relevancy, we said:

> This brings us to the other condition recognized in *Aldridge* [*v. State*, 398 So.2d 1308 (Miss. 1981) ]: *that the evidence of prior abuse may be received "to negate the idea that the injuries were the result of a fall or other isolated incident." Here the word "negate" is the key. It suggests that the evidence is relevant if there has in some manner been a prior effort by the defendant to convince the court and jury that the child's injuries were the result of a fall or other isolated accident*.

*Id.* at 606 (emphasis added).

¶71. This is precisely what occurred in the case at bar. Kolberg's theory was that he had done absolutely nothing wrong, and that Madison's injuries must have been an accident. The State's strategy throughout the trial, not simply in regard to this witness, was to refute Kolberg's accident theory. Accordingly, this evidence was properly admitted pursuant to Miss. R. Evid. 403 and 404(b), and this assignment of error is without merit.

¶72. In referring to *Darby v. State*, 538 So.2d 1168 (Miss. 1989), Kolberg also tells us the evidence is still inadmissible because the State must first show:

> that the element of the crime for which there is a recognized exception is a material issue in the case, and . . . there is a substantial need for the probative value of the evidence. The danger of prejudicial effect inherent in the use of similar acts evidence is such that all prerequisites must be met before the evidence may be admitted.

*Darby*, 538 So.2d at 1173. For the same reasons discussed above, this assignment of error is also without

merit.

**3.**

¶73. Kolberg next tells us that reversal is warranted because the trial judge did not give a limiting instruction. The rule in this instance is as follows:

> If an accused objects to Rule 404(b) evidence and the trial court, after conducting a Rule 403 analysis, finds that the probative value of the evidence outweighs the prejudicial effect, the trial court must treat the objection to the admissibility of Rule 404(b) evidence as a request for a limiting instruction.

*Webster v. State*, 754 So.2d 1232, 1240 (Miss. 2000). *See also Bounds v. State*, 688 So.2d 1362, 1371-72 (Miss. 1997) ("It was not until the recent decision by this Court in *Smith v. State*, 656 So.2d 95, 100 (Miss. 1995), that a trial judge was *required* to give a limiting instruction sua sponte." (emphasis added)).

¶74. However, as pointed out by the State, the above pronounced rule requires that the trial judge treat the *objection* to the Rule 404(b) evidence as a request for a limiting instruction. Kolberg tells us that he "objected strenuously and often." Yet, there was no objection within the meaning of this rule, thus this rule is inapplicable.

¶75. Kolberg filed a motion in limine to prevent the state from arguing any instances of prior abuse. From the context of the pretrial hearing on this motion, it appears the trial judge initially overruled this motion. In any event, the trial judge did overrule this motion at the conclusion of the pretrial hearing, both as to Kolberg's request for an evidentiary hearing, as well as his request that the evidence be excluded.[(4)]

¶76. During the trial itself, Laurel testified that she did not notice bruises, scrapes, bumps, or knots on Madison's face before Kolberg moved in with them. There was no objection from Kolberg. Laurel also testified that Madison was not a clumsy child. There was no objection from Kolberg. Laurel next agreed that she had never noticed constant bruises and bumps "all over" Madison prior to Kolberg's residence in their home. There was no objection from Kolberg.

¶77. Next, the State attempted to establish the length of time Kolberg lived in the home, and counsel for Kolberg did object twice, to counsel's *leading* the witness. After the State established that Kolberg had been in the home 49 days prior to Madison's death, the State moved into a third area: counsel asked Laurel if Madison began to have unexplained bruises during the time Kolberg was in the home. There was no objection from Kolberg. The State asked Laurel where most of Madison's bruises were located. There was no objection from Kolberg. Laurel said most of the bruises were on Madison's face, eye, and nose, and that she had a bruise behind one of her ears. There was no objection from Kolberg.

¶78. Next the State began to explore the justifications Kolberg gave to Laurel for the presence of the bruises. The State asked Laurel if she ever asked Kolberg what was happening to Madison. There was no objection from Kolberg. Laurel said that she did ask him "Bryan, why does she always seem to get hurt when she's with you?" There was no objection from Kolberg. When the State asked Laurel for Kolberg's response to her question, Kolberg objected "to this whole line." The trial judge overruled his objection and granted him a continuing objection.

¶79. Without doubt, Kolberg's objection "to this whole line" was not sufficient to invoke the sua sponte limiting instruction rule. "This whole line" could have several potential meanings. Thus, the "continuing objection" would apply to what? It suffers from the same infirmities as the objection "to this whole line." It is our opinion that if Kolberg wished to invoke the stringent protections afforded by the rule annunciated in *Smith*, he was required, at a minimum, to state the specific basis or reason for his objection. Accordingly, this assignment of error is without merit.

**4.**

¶80. Kolberg next asserts that use of this evidence of alleged abuse was the equivalent of illegally amending the indictment. He again relies on our decision in *Houston*, and draws our attention to that portion of the opinion which said: while "felonious child abuse may be charged and proved as an episodic series of occurrences. . .it need not be." *Houston*, 531 So.2d at 606. The charges against Kolberg did not assert a series of occurrences. Thus, he is apparently asserting that the State was bound by the date of alleged abuse stated in the indictment, i.e., the date of Madison's death, and that the State could not include any acts of abuse prior to that date, Accordingly, Kolberg claims the State silently amended the indictment by introducing the testimony of the prior bruises. He claims that our decision in *Lester v. State*, 692 So.2d 755 (Miss. 1997) forbids the State from doing this.

¶81. However, Kolberg again is in error in his assertions. The testimony of the prior bruises was not introduced as substantive evidence. It was introduced pursuant to Miss. R. Evid. 404(b) to negate Kolberg's claim that Madison's fatal injury was an accident. Thus it was relevant under Miss. R. Evid. 401 and properly admitted under Miss. R. Evid. 403 and 404(b). Consequently, this assignment of error is without merit.

### B. Whether the Testimony of Morina Jacobs was Inadmissible Hearsay.

¶82. Morina Jacobs provided child day care services for Madison and several other children in her home while their parents were at work. Her testimony at trial was similar to that of Laurel's: that Madison was happy and healthy prior to Kolberg entering her life and that she began to have bruises and injuries after Kolberg moved in with Madison and Laurel. Jacobs also testified that Madison was afraid of Kolberg and that she had changed drastically, becoming fearful and withdrawn, after Kolberg appeared in her life.

**1.**

¶83. Kolberg labels Jacobs as a gossip. He tells us that her testimony was used to convince the jury that he had a temper. He further tells us that "[t]he evidence from Morina Jacobs violated every one of the rules governing character evidence." According to Kolberg, the testimony of Jacobs, and later her son, Benjamin Jacobs, served only to demonstrate his character or trait of his character as set forth in Miss. R. Evid. 404(a)(1). The standard of review for the admission or exclusion of evidence is abuse of discretion. *Alpha Gulf Coast v. Jackson*, 801 So.2d 709 (Miss. 2001) (citing *Floyd v. City of Crystal Springs*, 749 So.2d 110, 113 (Miss. 1999)).

¶84. Rule 404(a)(1) states:

> **(a) Character Evidence Generally.** Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of Accused*. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same.

¶85. Jacobs testified that the first time she ever saw Kolberg was when he came to her home to pick up Madison for Laurel. Jacobs would not allow Kolberg to take Madison because she did not know who he was. The prosecution asked Jacobs what Kolberg's emotions were at that time. Jacobs answered: "He very [sic] highly upset." Counsel for Kolberg "object[ed] to his emotions." His objection was overruled. Jacobs testified that she did not allow strangers to take the children from her home because she was responsible for them while they were in her care. Kolberg further complains of Jacobs testimony regarding Kolberg's "temper" after she refused to let him take Madison. She said: ". . .And he got very aggressive. He tried to kind of buck me. And I told him that he would lose his tires if he didn't leave my driveway. I told him that I was going to shut the door and call the cops, which I did."

¶86. Kolberg tells us that Jacobs was further allowed to testify about his temper by stating what she had told detectives:

Q. And what was that? What had you observed about his temper?

MR. SMITH: I object, Your Honor. That is not relevant.

MS. WOOTEN: This is what she has observed, Your Honor.

THE COURT: Rephrase the question.

Q. Had you ever observed Bryan Kohlberg [sic] act angrily towards you?

Jacobs then answered that Kolberg had in fact acted angrily towards her and that he had "shown a temper" towards her.

¶87. Finally, Kolberg tells us the error in Jacob's testimony was compounded by the testimony of her son, Benjamin, as he was called to repeat her stories of Kolberg's temper. Kolberg draws our attention to the following testimony:

Q. And do you remember a time in particular when Bryan tried to come pick up Madison and your mom wouldn't let him have her?

A. Yes.

MR. SMITH: Your Honor, I must object to this.

THE COURT: Overruled.

Q. Now what happened that day when Bryan tried to come and pick up Madison?

A. My mother didn't let any of kids go until, you know, there was notification somebody else was coming to pick them up because she was responsible for them. And I guess Mrs. Laurie didn't call my mom and tell her that Bryan was coming to get her, and she wouldn't release her, and he kind of got upset.

Kolberg asserts this testimony violated Miss.R.Evid. 404(a) because he did not introduce any evidence regarding his character, thus there was nothing for the prosecution to rebut.

¶88. The State first responds by asserting Kolberg objected "to his emotions" on different grounds at trial than those he raises now, and is therefore barred from asserting error on a different ground now. We disagree. "[O]bjection on one ground at trial waives all other grounds for objection on appeal." *Carter v. State*, 722 So.2d 1258, 1261 (Miss. 1998) (citing *Lester v. State*, 692 So.2d 755, 772 (Miss. 1997)). The record reveals that when the State first inquired of Kolberg's anger and temper, he objected "to his emotions." He made no reference to Miss. R. Evid. 404 at this point. However, *Carter* went on to hold that "[w]here the specific grounds for objection are apparent from the context, a general objection is sufficient to preserve the error for appeal." *Id*. at 1261-62.

¶89. Kolberg draws our attention to questioning which occurred shortly following the State's first inquiry into his anger. Jacobs was testifying about her conversation with detectives and the State again inquired as to Jacobs' observation of Kolberg's anger. Counsel for Kolberg objected saying "that is not relevant." The record also reveals that counsel for Kolberg objected to her testimony *prior* to her ever taking the stand. He objected to three things: "One is talking about alleged instances of Mr. Kolberg's temper and, in particular, the supposed incident when Mr. Kolberg came to her house to pickup [sic] Madison. There is no possible relevance to this case, and as everyone knows from 404(b), prior specific acts such as that are totally impermissible." It is true that Kolberg cited Miss. R. Evid. 404(b) at trial, and now asserts Miss. R. Evid. 404(a) as the ground for error, yet Miss. R. Evid. 404 is the Rule governing character evidence generally. We think it contrary to the spirit of Miss. R. Evid. 404 to hold Kolberg barred from raising this issue here on appeal because of citing the wrong subpart of the correct Rule. Additionally we note that Miss. R. Evid. 103 (a)(1) provides:

> **(a) Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> (1) *Objection*. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context...

¶90. Although at trial, the objection was based on Miss. R. Evid. 404(b) and now the objection is based on Miss. R. Evid. 404(a), the language of Miss. R. Evid. 103(a)(1) allows the objection either way, because the specific ground was apparent from the context. The objection was obviously to the use of character evidence. Accordingly, the objection is properly preserved on appeal, and we will therefore address this issue here.

### 2.

¶91. Kolberg next asserts that Jacobs's testimony concerning the bruises on Madison's body was based purely on hearsay. Miss. R. Evid. 602 provides in part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." The Comment to Rule 602 makes clear that this rule *"does not prevent, however, the witness from testifying about hearsay statements*. He need only show that he has personal knowledge regarding the making of the statements. He cannot testify about the subject matter contained in the hearsay statement." (emphasis added). However, if the witness is testifying regarding hearsay statements, "Rules 801 and 805 are

applicable."*Id.*

¶92. The State again asserts Kolberg did not object to this testimony at trial on hearsay grounds, and that he is consequently, procedurally barred from raising it now. We disagree. Kolberg filed a motion in limine to prevent Jacobs' testimony. Also, immediately before Jacobs took the stand at trial, Kolberg again objected, and stated to the trial judge:

> She, in her prior testimony, has made it clear that there was only one statement that Mr. Kolberg made to her about Madison Watson's earlier injury, and that is on page 679 of the transcript, which is where she asked Mr. Kolberg, what happened on one occasion. He told me they were playing basketball when she fell. Now the other ones, if you look at all her other testimony, for example, on the busted lip she testified that it was Laurel who said that Madison had fallen out of Bryan's car. She testified that Laurel was the one who talked her [sic] on each of those other occasions. *And we would move in limine, over and above our motion to exclude all the stuff about bruising is totally irrelevant. We would move in limine to prevent her from talking about bruises and, certainly, any statements attributable to anyone else.*

(emphasis added). The trial judge overruled this motion and told Kolberg's counsel he would have to make a contemporaneous objection during Jacobs's testimony. Notwithstanding the learned trial judge's direction to defense counsel to make any objection at trial, we are constrained to hold on the record before us that this issue has been sufficiently preserved for appellate review. Jacobs testified on direct examination as if Kolberg told her justifications for the injuries she discussed. Yet, on cross-examination, in response to defense counsel's inquiry as to how she knew that the various bruises on Madison occurred while in Kolberg's custody, Jacobs said: "There was as far as I know - - I know it's hearsay, but that's what Laurie told me, he was the only one. They were playing basketball." Kolberg also complains of the following question the State propounded to Jacobs: "Did Bryan Kolberg ever tell you that he had two daughters in Wisconsin that he was not allowed to see?" Kolberg's objection was sustained; however, Kolberg tells us our decision in *Hosford v. State*, 525 So.2d 789, 792 (Miss. 1988) warrants a finding of reversible error here. In *Hosford*, we stated: "The error [deviant, sexual conduct with stepchildren] was egregiously compounded by the fact that the State, insofar as this record shows, had no evidentiary basis to ask such questions."*Id.* at 792.

¶93. Jacobs had first hand knowledge of the bruising, but she admitted she had only hearsay information from Laurel as to the source of Madison's bruises. If there be any perceived error on this hearsay testimony, such error was harmless beyond a reasonable doubt based on the status of the record at the time this testimony was put before the jury, which had already received competent testimony on this subject.

¶94. As to the State's question of Jacobs on whether she knew that Kolberg was not permitted to see his two daughters in Wisconsin, Kolberg promptly lodged an objection, his objection was sustained, and he did not request the trial judge to admonish the jury. Kolberg received from the trial court all that he requested - the sustaining of his objection. Additionally, *Hosford* affords no relief to Kolberg. In *Hosford*, the State was permitted, over defense objection, to (1) question a social worker about the conduct of Hosford toward his wife and stepchildren, and (2) question *the defendant* about what amounted to "deviant, sexual conduct" with his stepchildren. In the case, *sub judice*, Jacobs (a State's witness) was asked one question about her knowledge of Kolberg's not being permitted to see his children in Wisconsin, and the defense objection to that question was promptly sustained by the trial court. The factual scenario in *Hosford* is not

at all like the factual scenario here in Kolberg's case. Accordingly, this assignment of error is without merit.

**3.**

¶95. Kolberg next complains of the following testimony by Jacobs:

> A. . . .[Madison] had a playmate and her and her playmate were real close. Her name was Lindsey Dickson and her fear transported over to Lindsey. . .
>
> MR. SMITH: Your Honor, I must object to this.
>
> THE COURT: Overruled.
>
> \*\*\*
>
> Q. Do you know if Mr. Kolberg ever had to bribe Madison with cookies or ice cream to get her to go with him?
>
> MR. SMITH: Objection, Your Honor, to relevance.
>
> MS. WOOTEN: If she knows, Your Honor.
>
> THE COURT: Overruled.
>
> MS. WOOTEN: (Continuing)
>
> Q. Did you hear the defendant ever offer Madison cookies or ice cream to go with him?
>
> A. Yes, ma'am.

Kolberg tells us the following language from ***Houston v. State***, 531 So.2d 598 (Miss. 1988) mandates reversal:

> The "tears on the bus" testimony was without a credible predicate that the tears were caused by felonious child abuse by Houston, nor was it sufficiently specific. In short, a great portion of the prior abuse evidence strikes us as well below the minimum admissibility threshold on at least three grounds: relevancy, predicate and trustworthiness.

***Id.*** at 608, n.8. The State simply responds by saying that ***Houston*** is no authority.

¶96. The "bribing with cookies and ice cream" testimony is not hearsay. Here, Jacobs is merely testifying as to something she witnessed first hand. Miss. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As for relevance, this testimony tends to corroborate the earlier testimony about Madison not wanting to leave Jacobs to go with Kolberg. Additionally, in response to Kolberg's reference to the "tears on the bus" language of ***Houston v. State***, 531 So.2d 598 (Miss. 1988), Kolberg's case is factually different than ***Houston***. ***Houston*** pointed out that much of the prior abuse of the child victim (Paula) was brought out by way of hearsay testimony and that the prior abuse occurred over a period of years before Paula was killed by her mother. The "tears on the bus" testimony in ***Houston*** was elicited from a school bus driver who testified that "during the last year of

her life, Paula boarded her bus at least twice a week in tears." 531 So.2d at 604. As mentioned above, *Houston* found that there was nothing in the record to specifically show that Paula's tears on the school bus were caused by her mother's abuse. The *Houston* factual scenario is not at all analogous to the "cookies and ice cream" testimony here in Kolberg's case because the "cookies and ice cream" testimony is directly in line with prior testimony of the reluctance of Madison to go with Kolberg. The "cookies and ice cream" testimony and prior testimony of reluctance on the part of Madison are much more reliable and properly admissible relevant evidence than the testimony of a bus driver merely noticing a child regularly crying in the course of a year. As such, there is no reversible error here.

## 4.

¶97. Kolberg next asserts that the following testimony of Jacobs, in combination with the State's remarks during opening statements, violated his right against self-incrimination, his assertion of his right to counsel, and his failure to make statements after he had been advised by counsel not to speak to anyone:

> [Jacobs]: . . .and then he informed me that his uncle was going to get him a lawyer and his uncle had money. And I said, "What the hell do you need a lawyer for?"

> MR. SMITH: I object to that, Your Honor.

> THE COURT: Sustained.

> \*\*\*

> Jacobs] "Well, when he told me he needed a lawyer and I got kind of upset. I think that was when I was about to break, you know, and I didn't want to look him in the face. And I asked him, "Why in hell do you need a lawyer for?" And he told me, "Because everybody is blaming me."

> MR. SMITH: Objection, Your Honor. Your Honor, objection.

> THE COURT: Overruled.

> \*\*\*

> [Opening statements by the State]: ". . .He didn't confess to the crime. . ."

> \*\*\*

> [Objections by defense]:

> BY MR. DE GRUY: At the end of opening statements yesterday we made an objection to comments made by the prosecutor and moved for mistrial. We want the record to be clear that part of those comments and I had noted three separate comments that related to Mr. Kolberg's privilege against self-incrimination under both the federal constitution, [fifth] amendment and the State corollary rights. One specific comment was that he didn't confess, and those are prejudicial statements that are not proper at any time in the trial and certainly not in opening statement. Those comments, in addition to the other comments made that were clearly noted yesterday, we would ask the Court to consider in our motion for mistrial.

BY THE COURT: That will be overruled.

\*\*\*

[State's cross-examination of Bryan Kolberg]:

Q. How many times since that baby died have you called Laurel Watson - -

MR. SMITH: Objection, Your Honor. That would violate the privilege.

THE COURT: Overruled.

MR. MAYFIELD: (CONTINUING):

Q. How many times have you called her since that baby died to tell her you were sorry?

A. Sorry for what?

MR. SMITH: Your Honor, may we approach.

MR. MAYFIELD: (CONTINUING)

Q. How many times have you called her - -

MR. SMITH: Can we approach.

(BENCH CONFERENCE OUT OF THE HEARING OF THE JURY:)

MR. SMITH: As counsel, as his lawyer, I told him he is not allowed to talk to anyone. That is a totally unfair question.

MS. WOOTEN: How is that unfair?

MR. SMITH: It violates the privilege.

MS. WOOTEN: He said he was sorry for what happened.

MR. SMITH: Right. But he never - -

MR. MAYFIELD: I have every right to ask him if he ever expressed that.

THE COURT: Objection will be overruled.

MR. SMITH: I move for a mistrial on that.

THE COURT: Overruled.

¶98. As to the assertion that Jacobs's testimony improperly commented on his right to counsel, we agree with the State that he was not under arrest at the time and his "rights" had not attached. As to the allegation of error with the prosecution's statement during opening statements, we further agree with the State that when taken in context, the remark does not improperly comment on Kolberg's right against self-incrimination. The State said: "I mean we're obviously here because the State of Mississippi feels one way

and the defense feels another way. I mean that's the only reason we're here. He didn't confess to the crime, and we don't have an eyewitness, and I think you all agreed that nobody expects there to be an eyewitness when someone beats a child to death. . ." Thus, when taken in the context in which it was presented to the jury, this assertion of error is without merit.

¶99. Last, we address Kolberg's allegation that the State's questioning during his own cross-examination violated the attorney client privilege. Again, we are not persuaded. The attorney client privilege protects "confidential communications" between the attorney and client. Miss. R. Evid. 502(b). The State's question of how many times Kolberg had called Laurel after Madison's death, did not seek to elicit any "communication" between Kolberg and his counsel. Accordingly, this assignment of error is without merit.

**5.**

¶100. Finally, Kolberg asserts Jacobs's testimony that she quit keeping children in her home after Madison died because it was an emotional strain on her whole family was irrelevant. He also tells us Jacobs's testimony "continued in the same gossip vein" when she said that she thought Kolberg came to her house after Madison's death to see what she knew. He tells us the following language from **Smith v. State**, 499 So.2d 750 (Miss. 1986) warrants reversal:

> It is error in the course of a trial where one is charged with a criminal offense, for the State to inject extraneous and prejudicial matters and lay them before the jury. . .One of the ingredients of a fair and impartial trial is that an accused person should be tried upon the merits of the case. . .We commend vigorous prosecutions so long as they are conducted within the rules of evidence. Our adversary system of jurisprudence does not contemplate that attorneys for either side will be completely passive or indifferent during court trials; yet, fundamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial as shown by the record before us.

*Id.* at 756-57.

¶101. Without question, this testimony had no relevance as to the issue of whether Kolberg was guilty of the murder of Madison. Certainly, human nature being the way it is, the jurors were well aware of the emotional strain family members and friends suffer when there is a tragic and violent death of a young child. The jury was most likely not the least bit surprised that Jacobs felt the way she did. Additionally, the one statement by Jacobs that she thought Kolberg came by her house after Madison's death "to see what [she] knew", while perhaps error, hardly rises to the level of reversible error. In **Tanner v. State**, 764 So.2d 385, 399-400 (Miss. 2000) this Court, in setting out the basic test for harmless error, stated:

> [T]he inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether the error was unimportant in relation to everything else the jury considered on the issue in question.

*Id*. at 399-400 (citing from **Thomas v. State**, 711 So.2d 867, 872 (Miss. 1998)). Testimony on these two particular instances are at most harmless error and certainly had no effect on the eventual outcome of the trial.

### V. WHETHER MEDICAL EXPERT WITNESSES SHOULD HAVE BEEN PRECLUDED FROM GIVING THEIR OPINIONS THAT THE INJURIES WERE INTENTIONALLY

**INFLICTED.**

¶102. Kolberg next raises allegations of error regarding several aspects of the testimony of the State's expert witnesses. He tells us a pretrial hearing should have been conducted in light of the complex scientific and medical evidence.

## A.

¶103. Essentially, the allegation of error Kolberg asserts here is that the State's expert witnesses were allowed to testify that the injuries were inflicted intentionally. He tells us that *United States v. Charley*, 176 F.3d 1265, 1297 (10th Cir. 1999) says that generally an expert is not allowed to give an opinion that injuries on a child abuse victim were intentional "because, in such cases, the expert offering the opinion is merely vouching for the credibility of the alleged victim."

¶104. *Charley* (*Charley I*), which has since been withdrawn and superceded by *United States v. Charley*, 189 F.3d 1251 (10th Cir. 1999) (*Charley II*) did contain that quote, but in a different context. A pediatrician had been allowed to testify that she believed two girls had been sexually abused because they wet the bed. The pediatrician had ordered a work-up to determine if there was an anatomical problem which caused the bed wetting. The tests revealed no anatomical problem. The Tenth Circuit rejected her testimony stating that if her opinion was based on the girls' medical history, there was no showing as required by Rule 702. *Charley I*, 176 F.3d at 1278-79. Kolberg's quotation was extracted from what the Tenth Circuit saw as the other alternative: "On the other hand, if Dr. Ornelas' opinion was largely based on crediting the girls' account, whether disclosed to her or others [e.g., their mother], she was essentially vouching for their truthfulness." *Id.* at 1279. In this same vein, the court went on to say: "Most courts that have considered the issue have concluded that expert testimony, *based on the statements of the alleged victim*, that sexual abuse in fact occurred is inadmissible under Fed. R. Evid. 702 (or similar military or state evidentiary rules) because, in such cases, the expert offering the opinion is merely vouching for the credibility of the alleged victim." *Id.* (emphasis added).

¶105. Thus, while Kolberg's quotation sounds favorable to his assertion, when put in context, it clearly is inapplicable here. For Kolberg's assertion of law to apply, the State's expert witnesses would have had to rely on Madison Watson's version(s) of sexual abuse perpetrated upon her by Bryan Kolberg. Nothing close to this happened here. Kolberg provides no further legal citation in support of this argument, and our research produced nothing that would support this argument. Consequently, this Court concludes that this assignment of error is without merit.

## B.

¶106. Kolberg argues here that the State's witnesses were not qualified to testify that Madison had been abused. He specifically refers to Drs. Meador and Vise and states that neither of them has published a single article on child abuse. Further, Kolberg says that even if they were qualified, their testimony was inadmissible evidence.

¶107. As pointed out by the State, our decision in *Ivy v. State*, 522 So.2d 740 (Miss. 1988) is directly on point. In *Ivy* we said:

> [T]he doctor could still have given his opinion based on his prior experience with children in the emergency room. Miss. R. Evid. 702. Such a determination necessarily involves the exercise of a

certain amount of discretion on the part of the trial judge. ***Hardy v. Brantley***, 471 So.2d 358, 366 (Miss. 1985) (in a discussion which the Court stated to be consistent with proposed Rule 702). In federal courts, the qualification of an expert lies within the sound discretion of the trial judge, whose ruling will not be overturned in the absence of clear abuse. 3 Weinstein's Evidence 702[04] (1987).

522 So. 2d at 743-44.

¶108. Upon review of the record in this case, it is apparent that the case before us complies with ***Ivy***. Although Kolberg tells us the doctors' testimony should have been excluded pursuant to ***Goodson v. State***, 566 So.2d 1142 (Miss. 1990), we agree with the State that ***Goodson*** dealt with testimony regarding "child sexual abuse syndrome," and consequently, ***Goodson*** is inapplicable here. A review of the record indicates these doctors testified as to their opinions based on their experience. Kolberg did not object initially as to their ability to testify as experts. With respect to Dr. Meador, counsel for Kolberg said: "Your Honor, again, we have no problems with Dr. Meador testifying." With respect to the objections Kolberg made to their testimony, it is obvious to this Court that ***Goodson*** and Miss. R. Evid. 702 render this argument without merit.

¶109. Kolberg next tells us the State sought to establish through its expert witnesses that he was "guilty by profile." Kolberg targets this complaint against Doctors Meador and Plunkett. He objects to the following testimony of Dr. Meador:

> Q. And with children that are abused is there normally just the perpetrator and the child present?
>
> A. In my experience usually so.
>
> Q. Usually there is whoever did the abuse and the child?
>
> A. Usually in my experience.

Kolberg also complains of the following testimony during cross-examination of Dr. Plunkett:

> Q. Would you also agree that you have previously testified that more often than not it is the boyfriend that causes injuries to children?
>
> MR. SMITH: Your Honor, I object, again, to statistical trials.
>
> MS. WOOTEN: This is Dr. Plunkett's testimony.
>
> THE COURT: Overruled.
>
> A. Yes.

Kolberg directs our attention to ***Powell v. State***, 527 A.2d 276 (Del. 1987); ***Commonwealth v. Day***, 409 Mass. 719, 724, 569 N.E.2d 397, 399-400 (1991); and ***State v. Hudnall***, 293 S.C. 97, 359 S.E.2d 59 (1987). ***Powell*** held the statistical data at hand was plain error because it violated Delaware's rule that "the expert may not directly or indirectly express opinions concerning a particular witness' veracity or attempt to quantify the probability of truth or falsity of either the initial allegations of abuse or subsequent statements."***Id.*** at 279. The court went on to say that "the significance of the expert's 'percentage' testimony in this case is obvious." ***Id.*** The expert had testified that 99 percent of alleged victims in sexual abuse

treatment programs were telling the truth. *Id.* The court felt that the expert had essentially given a "mathematical evaluation of the victim's veracity." *Id.* at 280.

¶110. The expert in *Day* testified to, what the court termed, a "child battering profile." *Day*, 409 Mass. at 723. The expert had testifie d as to "family characteristics" associated with child abuse, "'risk factors' in child abuse cases such as a 'repeated pattern' of partners of single mothers who sometimes 'offend against [the] children' while the mothers are at work," and "another 'pattern' recognized in child abuse cases is when a single parent, usually the mother, has several partners who bring alcohol and drugs into the home." *Id.* The expert also testified that 60 percent of the cases of reported child abuse "involved" the use of drugs. *Id.* at 722.

¶111. Kolberg's reliance on *Hudnall* is misplaced as that court has now expressly overruled that decision, saying:

> Appellant next claims error in the admission of rape trauma evidence to prove a rape actually occurred. He relies on *State v. Hudnall*, 293 S.C. 97, 359 S.E.2d 59 (1987), in which this Court held expert testimony regarding common behavioral characteristics exhibited by child victims of sexual abuse was not admissible to establish abuse had occurred. We held this evidence admissible only to rebut a defense claim that the victim's response was inconsistent with such a trauma. In *State v. Alexander*, 303 S.C. 377, 401 S.E.2d 146 (1991), however, we held trauma testimony of a rape victim is relevant to prove the elements of criminal sexual conduct since such evidence makes it more or less probable that the offense occurred. We further held such evidence admissible where its probative value outweighs its prejudicial effect. *Id.* We now expressly overrule *State v. Hundall* to the extent it in inconsistent with *State v. Alexander* and clarify that both expert testimony and behavioral evidence are admissible as rape trauma evidence to prove a sexual offense occurred where the probative value of such evidence outweighs its prejudicial effect.

*State v. Schumpert*, 312 S.C. 502, 506, 435 S.E.2d 859, 861-62 (1993).

¶112. There is no legitimate comparison between Dr. Meador's testimony and the offending expert testimony discussed in the cases on which Kolberg relies. Additionally, Dr. Meador's testimony, even when viewed most favorably to Kolberg, simply does not establish a profile. With respect to the answer the State elicited on cross-examination, even if such evidence is deemed to be error, such error would be harmless. It was an isolated question, and it too, fails in comparison to the cases on which Kolberg relies. Accordingly, this assignment of error is without merit.

### C.

¶113. Kolberg next relies on Miss. R. Evid. 104(a) and asserts the trial court erred by not conducting a pretrial hearing. Rule 104(a) states:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Kolberg further tells us that the testimony of the State's expert witnesses could not have passed the muster of *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir. 1923). *Frye* requires the scientific evidence to be

"generally accepted" in the scientific community to be admissible. ***Gleeton v. State***, 716 So.2d 1083, 1087 (Miss. 1998). Kolberg has addressed this argument in three subsections. Therefore, for the sake of clarity, we will do so as well.

¶114. Kolberg tells us that "there is no agreement in the medical profession that a particular set of circumstances or a particular medical profile defines the 'Battered Child Syndrome,' or makes it possible for a medical profession to testify that a child has been 'battered' rather than sustaining injuries from another source." Thus, Kolberg concludes that it is impossible for the State to meet the burden of proving the existence and general acceptance of a definition of "child abuse."

¶115. This Court agrees, as argued by the State, that our decision in ***Crawford v. State***, 754 So.2d 1211 (Miss. 2000), recognized a medical diagnosis of child abuse, and therefore, there was no need for a pretrial hearing regarding whether child abuse was a generally medically accepted diagnosis. This Court further agrees with a distinction drawn by the State: while this Court has not recognized abuse "syndromes," we have recognized diagnoses of abuse in the context of specific facts. The State correctly argues that its experts testified as to their observations and conclusions with respect to the victim, not to "syndromes." Consequently, this assignment of error is without merit.

¶116. Kolberg further argues that the trial court should not have permitted testimony that medicine *knows* that a short fall cannot cause fatal injuries. On this point, Kolberg complains of the testimony given by Dr. Andrew Parent. Kolberg tells us that Dr. Parent "was permitted to state medical 'doctrine' on the subject of short-fall injuries as if it were a law of physics." Kolberg provides no legal citation to support this assertion of error, but argues instead in terms of "common sense." Further, we agree with the State that this boils down to a question of credibility. "The jury is the sole judge of the credibility of witnesses." ***Billiot v. State***, 454 So.2d 445, 463 (Miss. 1984). Accordingly, this assignment of error is without merit.

¶117. Kolberg goes on to argue the sufficiency of medical evidence to support a finding of child abuse. He provides us with three pages of excerpts of the testimony of the State's expert witnesses under this subcategory. He tells us that the retinal hemorrhages, subdural hematoma, and cerebral edema were presented to the jury as the "medico-gospel truth" as identifiers of child abuse. We disagree.

¶118. Once again, Kolberg is simply attacking the credibility of the witnesses. Accordingly, we believe this argument fails for precisely the same reasons as discussed in the immediately preceding subsection. Further, a review of the entire record reveals that the experts properly relied on these injuries as their bases for concluding Madison's injuries were not accidental or self-inflicted. For these reasons, this assignment of error is without merit.

### VI. WHETHER THE TRIAL COURT WAS IN VIOLATION OF THIS COURT'S FINDINGS IN *FOSTER v. STATE*, IN ALLOWING EXAMINATION OF WITNESSES ON THE ISSUE OF WHAT "COULD" HAVE HAPPENED.

¶119. Kolberg next tells us that the State was permitted to ask witnesses about what "could have" happened. Kolberg tells us that "could have" testimony violates our decision in ***Foster v. State***, 508 So.2d 1111 (Miss. 1987), *overruled on other grounds*, ***Powell v. State***, 806 So. 2d 1069 (Miss. 2001). In ***Foster***, the defendant was convicted of capital murder. The victim's body was found in a vacant lot. Lab tests were conducted on paint chips found on the victim's clothing in an attempt to establish a connection with paint chips found on the front seat of Foster's car. At trial, a chemist testified that the paint chips were

"indistinguishable in color, texture, and inorganic chemical composition; and that they therefore could have a common origin." *Id.* at 1117. The State also provided expert testimony that the stab wound to the victim's chest was caused by "this knife [i.e., the knife found in Foster's car] or another one very similar." *Id.* Foster argued before this Court that the "could have" testimony was too speculative to be admissible. We agreed.

¶120. We began our analysis by determining that the testimony of the two experts was relevant. *Id.* at 1117-8. A majority of the Court, excluding the author, believed that under a Rule 403 balancing, use of "could have" "minimized the evidence's probative value and maximized its tendency to mislead the jury." *Id.* at 1118. Thus, the majority concluded by stating that on remand, "use of the terms 'possible' and 'could have' should be avoided." *Id.* The Court suggested using the term "consistent" instead. *Id.*

¶121. We feel that it is important to note that *Foster* was not reversed on this issue. *Foster* was reversed "because the trial court improperly limited Foster's cross-examination of the State's key witness." *Id.* at 1112. We addressed Foster's remaining issues in anticipation that they might arise again on remand. *Id.* at 1115.

¶122. Kolberg quotes three questions which he says violated *Foster*. All three arise with questions the prosecution asked Dr. Meador. They are as follows:

> Q. And could you say if those bruises were put there that day? Could they have been put there that day?
>
> A. They could have been, but I could not date them precisely for you.
>
> . . . .
>
> Q. But it could be consistent with someone beating her with their fist, hands or a blunt object?
>
> A. Yes, it could be.
>
> . . . .
>
> Q. So that could have been a separate blow to her face that day?
>
> A. I would think so.

As an initial matter, the second quotation may be dispensed with as it used the term "consistent" which was the term suggested by the *Foster* Court. As to the first quotation, Kolberg made no objection. Kolberg did, however, object to the third instance and his objection was sustained. The trial judge instructed the prosecutor to rephrase the question, and the prosecutor then used the magic term "consistent."

¶123. The point which troubled the majority in *Foster* was the tendency the term "could have" would have to mislead the jury. *Foster*, 508 So.2d 1118. For this reason, the *Foster* court thought the probative value of the experts' testimony was substantially outweighed by the danger of misleading the jury. *Id.* at 1117-8 (citing Miss. R. Evid. 403). However, this Court today does not have the troublesome issue before it as did the *Foster* Court. Kolberg did not object to the first instance of which he now complains, and when he did object, his objection was sustained. The State then rephrased the question. The one instance which passed without objection, in light of Dr. Meador's testimony in its entirety, simply cannot be said to render the probative value of the testimony as substantially outweighed by the danger of misleading the jury.

Consequently, this assignment of error is without merit.

## VII. WHETHER KOLBERG WAS LIMITED IN HIS RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.

### A.

¶124. The State called as one of its witnesses James Donald, who was the nursing coordinator at the time Kolberg brought Madison to the emergency room. Donald was called to gain information (a history) from Kolberg. No doubt, Donald had taken extensive notes in his "interview" with Kolberg regarding what may have happened to Madison. Donald testified as to the version of events as Kolberg had relayed them to him. Apparently in an attempt to rehabilitate Donald, the State specifically elicited from Donald that he "took very extensive notes concerning this conversation between [him] and Mr. Kolberg." The State even had Donald testify that he drew pictures. In short, the State attempted to place reliance on Donald's notes and show that any version of events missing from the notes were missing because Kolberg had not relayed them to Donald. Yet, it is obvious that the defense theory was that if Donald could not remember what Kolberg looked like, it is entirely possible that events not noted by Donald had been conveyed by Kolberg to Donald, and that Donald had simply forgotten them in the twelve year interim. We turn now to that point in the record depicting the events of which Kolberg now complains.

¶125. The following event occurred during direct examination:

Q. Would you recognize Bryan Kolberg again if you saw him?

A. Yes.

Q. Which individual is he?

A. The gentleman with the green jacket with the glasses.

[Witness apparently *points to defense attorney* Andre Degruy.]

Q. That's actually - -

BY MR. SMITH: -Objection. Can't lead the witness.

A. No, that is not him.

BY MS. WOOTEN: (Continuing)

Q. Do you know - - can you recall? I know it's been a long time.

A. I don't know.

Q. Okay. It's been at least twelve years.

A. He was dark haired.

Q. So one of the individuals over there. Do you recognize them?

A. No, I don't.

Q. Okay. But you did speak to the boyfriend, the person that brought this individual in?

A. Yes.

Kolberg now tells us that the following events on cross-examination deprived him of his right to confront the witness against him:

Q. Just for the record, Mr. Donald, you and I have never met, right?

A. No, sir.

Q. Okay. And for the record when you were asked to identify Bryan Kolberg, you pointed out this guy right here in the green jacket, right?

A. That is true, but my eyes have gone real bad in the last few years, so unless you're within a certain distance - -

Q. - - It's easy for anybody to make mistakes, isn't it?

A. Right.

Q. And I'm going to show you this driver's license [i.e., Mr. Smith was attempting to hand the witness the driver's license of defense attorney Andre Degruy] and see if you can recognize that as the person in the green jacket over there.

BY MS. WOOTEN: Your Honor, I object to this.

BY MR. SMITH: I just need to make a record.

BY MS. WOOTEN: Your Honor, I object. Mr. Donald made a mistake on identifying Mr. Kolberg who he interviewed twelve years ago. I don't think there's a question of who the person was.

BY MR. SMITH: (Continuing)

Q. Would you agree that that is actually - -

A. - - I can't tell that's the gentleman over there - -

BY MS. WOOTEN: - - Your Honor, I've made an objection.

BY THE COURT: Objection will be sustained.

Kolberg tells us that after the defense proved Donald had identified the wrong person, "the defense should have been permitted to rake him over the coals for his mistaken identity." However, if one looks closely at the record, it is obvious that defense counsel had unequivocally made his point with the jury, and that is that the State's witness had absolutely identified co-counsel for the defense as the defendant, Kolberg. In other words, the witness had misidentified the defendant before the jury. The only denial of cross-examination on this point was when the trial court sustained the State's objection when defense counsel was trying to ask the witness if the photo on the driver's license was that of defense co-counsel whom the witness had misidentified as the defendant. First of all, that point had already been made before the jury, and secondly,

once the State's objection to that question had been sustained, defense counsel continued his cross-examination of Donald on his misidentification of the defendant. Note the next two questions of defense counsel to Donald after the State's objection had been sustained:

> Q. You'll agree that even in the calm of the courtroom like this it's easy for people to make mistakes, wouldn't you?

> A. I would say anything was possible.

> Q. Right. And when you're really upset and when you're told that a child close to you is potentially dying, it's easier to make mistakes, isn't it?

> A. I would say so.

¶126. "The right of confrontation and cross-examination extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony." *Myers v. State*, 296 So.2d 695, 700 (Miss. 1974). However, here, Kolberg was not denied his right to confront the witnesses against him based on the trial court's sustaining the objection to one question. After the sustaining of the objection, defense counsel continued the cross-examination of the witness on misidentification and then for whatever reason, Kolberg's counsel chose at some point to move to another line of questioning. No proffer was made as to what evidence would have been offered by Kolberg but for the trial court's purported limiting of cross-examination of a State's witness. Accordingly, this assignment of error is without merit.

## B.

¶127. Kolberg next complains that he was not permitted to impeach some of the State's experts with evidence that they had been found to have committed malpractice in the past. If there is anything about past conduct which reflects upon knowledge, clearly it is admissible. *Bankers Life & Cas. Co. v. Crenshaw*, 483 So.2d 254, 277 (Miss. 1985), *aff'd on other grounds*, 486 U.S. 71, 108 S. Ct. 1645, 100 L. Ed. 2d 62 (1988). "When particular credit is concerned, particular inquiries are proper." 483 So. 2d at 277 (citing *Wood v. American Life Ins. & Trust Co.*, 8 Miss. (7 How.) 609 (1843)). "The question is whether such past conduct [is] relevant to the inquiry." *Id. Bankers Life* applied this rule to a doctor who had been impeached by questioning regarding prior law suits filed against him. This Court noted that there was no request made for an in-chambers determination of whether a suit "in any way bore upon his professional qualification to express an opinion." *Id.* The Court concluded by saying: "We cannot find an abuse of discretion on the part of the trial court, and even if there were, it was not reversible error. In these litigious times the mere fact that some person has been sued hardly effects either his reputation or credibility." *Id.*

¶128. Applying the abuse of discretion standard, we find this assignment of error is without merit. Kolberg desired to inform the jury that one specific doctor had been sued for malpractice for improperly reading a CT scan. Kolberg argued that this doctor's testimony regarding the importance and accuracy of CT scans was completely inapposite in the deposition taken when he was the defendant than it was on Kolberg's trial. The trial judge did not allow Kolberg to inform the jury that the doctor had been sued for malpractice or any of the facts surrounding that case. However, the trial judge did allow Kolberg to use any prior inconsistent statements, i.e., the depositions from the suit, for impeachment purposes. Because the trial judge allowed the prior inconsistent statements, the error, if any, of not allowing Kolberg to tell the jury that

the doctor had been sued for malpractice and settled the case, is without merit.

## C.

¶129. Kolberg next complains of a note found in Laurel's car. Kolberg had been to the dentist, and Laurel had picked him up. He was not able to talk because he had a mouth full of gauze, so he was writing notes down on a piece of paper and Laurel was verbally responding. The damaging portion of the note was a the written statement: "All she has to do is bump into something." The State attempted to establish Kolberg wrote that out of frustration with Madison and in reference to the child. Counsel for Kolberg attempted to fill in the blanks which would have represented Laurel's verbal contribution to the conversation. The following dialogue occurred after the State's objection, and now serves as the basis of Kolberg's complaint:

> Q. And it's a fair assumption that when he said, "uncle," that it was his uncle, John Huber, who was going to pick it up; is that right?
>
> MR. MAYFIELD: Excuse me, Your Honor. I see some dialog in there that is not supported by the -- there is some in the italicized portion. That's not in evidence, and I assume it came from counsel's head. I am going to object to that.
>
> THE COURT: I sustain the objection. *I can't read the document*. I haven't seen what it's - -
>
> MR. SMITH: (Continuing)
>
> Q. It would be fair to say that you probably at some point asked him where he wanted to go?
>
> MR. MAYFIELD: That's my objection, Your Honor.
>
> MS. WOOTEN: Your Honor, it calls for speculation is why I objected to it to begin with.
>
> THE COURT: I sustain objection.

Kolberg's basis for his assertion of error now is that the judge should not have sustained the objection if he couldn't see what the objection was about. While the trial judge sustained the objection to that question, the record reveals that Kolberg continued with this "would it be fair to say" fill in the blank line of questioning. There were no further objections by the State. Thus, Kolberg's questioning in this fashion was not inhibited in any respect. Further, Kolberg specifically said he did not deny that he wrote the note, although we do not see that he ever specifically admitted that it was. Accordingly, we find that this assignment of error is without merit.

## D.

¶130. Kolberg asserts confrontation violations in regard to more of the State's witnesses in this subsection. He begins with Officer Charlie Crisco. Kolberg tells us the State was permitted, over objection, to elicit hearsay testimony concerning the basis of probable cause for securing his arrest warrant. Kolberg further tells us that this opened the door for him to cross examine Officer Crisco, and that the State's hearsay objections to his questions were improperly sustained. According to Kolberg, this allowed the State to

improperly buttress its case "by implying that [he] could not have been arrested but for the magistrate's finding of probable cause."

¶131. Kolberg refers us to the point in the record where the State asked Officer Crisco "Did you have probable cause to get this arrest warrant," to which the officer responded "yes." Counsel for Kolberg objected, and this objection was sustained. He tells us that "the [State's] hearsay efforts just went on and on, and there was absolutely *no basis* for any of this line of questioning." (emphasis in original). However, the record reveals that the State immediately dropped the subject, and it was approximately 16 pages later in the transcript before the subject resurfaced.

¶132. The State sought to have Officer Crisco testify as to why Kolberg was arrested. However, the State attempted to reintroduce this subject by asking the officer "why would you arrest one person over another." Kolberg's objection was sustained on the basis of relevance. The following questioning is what Kolberg now asserts is impermissible as hearsay, and which, he says, opened the door for him:

Q. Why did y'all arrest Bryan Kolberg for the murder of Madison Watson?

BY MR. SMITH: And I must object to that.

BY THE COURT: I'll let him answer that.

A. He was arrested - - originally arrested for aggravated assault on the afternoon or late afternoon of August the 22nd. The investigation revealed that he had sole custody of the child from 8:00 that morning until he took the child to the hospital at approximately 4:00 that afternoon except for the time that he spent with the mother. Based on the fact that he was in sole custody, based on statements given to me by Dr. Vise, who was - - who I spoke with on August the 22nd, Dr. Vise indicated to me that - -

BY MR. SMITH: - - I must object to hearsay, Your Honor.

BY THE COURT: Sustained.

BY MS. WOOTEN: (Continuing)

Q. What conclusions did you draw from Dr. Vise's report?

A. That the child had received severe trauma to the head and that these injuries had occurred within a four hour period prior to the arrival of the child at the hospital, from noon until 4 p.m.

Q. And based on those facts is that why y'all made an arrest?

A. That's correct.

There are questions which asked the officer for hearsay responses, and the State even concedes as much. However, as pointed out by the State, Kolberg's objections to the hearsay statements were sustained.

¶133. In *Swindle v. State*, 502 So. 2d 652 (Miss. 1987), this Court held the admission of out-of-court statements made to a police officer during the course of an investigation was permissible. This Court stated "[i]t is elemental that a police officer may show that he has received a complaint, and what he did about the

complaint without going into the details of it." *Id.* at 658 (citing *Tolbert v. State*, 407 So.2d 815 (Miss. 1981)). In *Swindle*, a narcotics agent testified about a tip he received from a confidential informant as to the whereabouts of the defendant. 502 So. 2d at 657. Although the out-of-court statement of an informant is generally inadmissible as hearsay where it is part of the State's proof on the merits of the case, this Court held the tip was admissible to the extent required to show why the officer acted as he did and why the officer was at a particular place at a particular time. *Id.* at 658.

¶134. We do not agree with Kolberg's assertion that Officer Crisco was allowed to testify about hearsay statements. But to the extent he did, if any, it was clearly for the purpose of providing the basis of his investigation, and the ultimate arrest, of Kolberg. Consequently, this assignment of error is without merit.

¶135. We also agree with the State that to the extent Kolberg asserts he should have been allowed to elicit hearsay from Officer Crisco during cross-examination, this assignment of error is also without merit. The State directs our attention to our decision in *Murphy v. State*, 453 So.2d 1290 (Miss. 1984), where we said:

> There is no hearsay exception based upon the scope of examination. You may allow its admission by failing to object to it, but you simply cannot "open the door" to hearsay. Hearsay is incompetent evidence. You may open the door for collateral, irrelevant, and otherwise damaging evidence to come in on cross-examination, but Mississippi recognizes no rule of law that allows double hearsay to be brought in through this open door.

*Murphy*, 453 So.2d at 1294 (citations omitted). Accordingly, this assignment of error is without merit.

¶136. Kolberg also complains that he was not allowed "to impeach witnesses in more pedestrian ways. For example, Dr. Meador had made a prior inconsistent statement to one of the State's investigating officers, as related in his police report. The defense simply sought to bring this out." The State's hearsay objection was sustained as counsel for Kolberg was attempting to impeach Officer Crisco with Dr. Meador's alleged prior inconsistent statements. Accordingly, this assignment of error is without merit.

### E.

¶137. Kolberg next asserts that the State used Charlie Smith, a crime scene investigator with the Jackson Police Department who took photographs of Madison's body during the autopsy, to introduce the testimony of the pathologist, Dr. Galvez. Kolberg tells us the State did this because it "absolutely did not want to call the pathologist in this case." Kolberg's portrayal of Smith's testimony is that Smith said everything Dr. Galvez would have said had he been called to testify. Thus, Kolberg says that he was wrongly denied the right to cross examine Dr. Galvez. Kolberg is in error. While the portions of the record Kolberg cite seem to support his position, a review of Smith's testimony reveals a different story.

¶138. Kolberg objected prior to Smith's testimony asserting that "he's not an expert and can't possibly describe what they all mean." The court overruled the objection because Smith's testimony was to authenticate the pictures. Counsel for Kolberg said: "To identify them I have no problem except for the objection I'm going to make to these gruesome ones in terms of admissibility. . ." Although Kolberg vehemently argues that Smith testified as to what Dr. Galvez would have said, the record shows that Smith's references to Dr. Galvez were nothing more than that he took certain pictures because he was told to. Smith's testimony authenticated the pictures by relating that he was the photographer and he identified each

picture. He offered no interpretation about the significance of the injuries, not from his own perspective, and certainly not from Dr. Galvez's perspective. The State also correctly notes that when counsel for Kolberg asked Smith to express an opinion on the significance of certain photographs, he declined to do so saying instead that "I wouldn't know," and "I'm not a pathologist." Accordingly, this assignment of error is without foundation in the record and totally devoid of merit.

## F.

¶139. Kolberg also asserts he was denied his right to confrontation with regard to Morina Jacobs's son, Benjamin Jacobs. Kolberg asserts that at trial he sought to establish that both Morina and Benjamin were prejudiced against him, and that both individuals were making up stories about him. The following portion of the record is the basis for Kolberg's complaint before us:

Q. Okay. And in terms of this, do you feel like you are prejudiced against Bryan Kolberg or not?

A. Excuse me?

Q. Do you feel like you are prejudiced against Bryan Kolberg?

A. No.

Q. You don't feel like you are a prejudiced sort of person altogether?

A. No.

Q. You do feel that 99 percent of black people act like you owe them something, though; don't you?

MS. WOOTEN: Your Honor, what is this?

MR. MAYFIELD: Your Honor - -

THE COURT: Sustained. Objection will be sustained.

MS. WOOTEN: That is absolutely outrageous.

THE COURT: Mr. Smith, I - - you know, I'm a little disappointed.

MR. SMITH: Your Honor - -

THE COURT: Objection will be sustained.

MR. SMITH: Your Honor, if I may make a record later on that.

THE COURT: You certainly may.

MR. SMITH: Thank you.

MR. MAYFIELD: Make it in the presence of the jury?

MR. SMITH: No. I will make it later outside the presence of the jury if I must.

MR. MAYFIELD: I would ask that the jury disregard and counsel be admonished. That's outrageous.

THE COURT: The jury will disregard it.

MR. SMITH: Note my objection, Your Honor. Thank you.

Counsel for Kolberg then quotes us his argument before the trial judge, which was heard outside the presence of the jury. However, to place everyone's arguments in perspective, we will include argument given by the State, as well as, the comments and ruling of the trial judge:

MR. SMITH: Your Honor, I need to make a record on the limitation on cross there. I was impeaching that witness with his statement given to my investigator: "Well, I guess I am prejudiced. I really don't like them" - - by which he meant black people- - "I mean, 99 percent of them act like you owe them something." After which he went on to say that he considered all white trash the same way and that he used people in that way. That is classically what you do in cross-examination. It's to expose biases and prejudice. And a person who is prejudiced is prejudiced. And it's totally legitimate cross-examination. I object to being cut off from doing it. I object to the Court making statements about how that was improper. It is entirely proper. And I request that the jury be instructed that what I did was entirely proper, and I request that I be allowed to complete that impeachment.

MR. MAYFIELD: It is not proper, Your Honor. And 616 - - Rule 616, it speaks of bias, requires that prejudice or bias be shown either for or against a party to the actions. That is just for obvious purposes. The Court knows what he was doing.

MR. SMITH: No, that is not true. He considers Bryan Kolberg white trash, and he considers that he can say that, and I think that's critical to exposing the biases.

THE COURT: Well, you have a way of being very artful in your assessment of the evidence. The defense, like the state, is not authorized or entitled to create their own open door and then leap through that door to evidence which they know is highly prejudicial and totally inadmissible. And the evidence of racial bias, which you have consistently tried to interject in this trial, is not admissible unless it has some relevance to the defense of your client. Your well worded attempts to make that type of evidence relevant falls short.

If you attempt to place any more racial prejudice issues before the jury, then I want you to let the Court excuse the jury before you bring that information out, recognizing that there are seven blacks and five whites on the jury. I don't sit here in a vacuum and not understand the motives of your questioning, but the rule that the means justifies the ends is not a judicial principle.

MR. SMITH: Your Honor, I understand the Court's ruling. I must take exception. And I understand where the Court is coming from, and please don't think that I am being critical of the Court, but I do object to being accused of racial discrimination. That's not it. Bias and prejudice, and I challenge the state to come up with one case that says that a witness's bias and prejudice is not a legitimate source of cross-examination. I understand the Court's ruling, and I will abide by it, and I will bring it up before I do it, but I vehemently object to it, Your Honor.

THE COURT: I am not telling you that that type of evidence may not be at some point in time

admissible, and, particularly, if the state creates a circumstance where it would be relevant, but before we present that type of evidence to the jury I want the jury excused and the Court make a ruling on it.

Kolberg tells us that it was error for the trial judge to sustain the objection and that "it was double error for the trial court to chastise defense counsel, in front of the jury, by saying that he was 'disappointed' in counsel."

¶140. Miss. R. Evid. 616 provides: "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible." However, the State tells us that "[t]here were no racial issues lurking about this case because none of the actors were of different races." Since the witness was white, the defendant was white, and the victim was white, there is no legitimate evidentiary purpose for defense counsel's questions to Benjamin concerning his feelings about "black people." Kolberg asserts in his arguments before us that Benjamin regarded him as "white trash," but gives us nothing to substantiate this claim. Consequently, we conclude that Kolberg's racial questions were irrelevant, highly prejudicial, and properly excluded. Accordingly, this assignment of error is without merit.

¶141. Finally, Kolberg's claim that it was "double error" for the trial judge to say that he was "disappointed" in defense counsel in front of the jury: Kolberg cites Miss. Code Ann. § 99-17-35, which states, in pertinent part: "The judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of the evidence." Thus, this statute is not applicable here as counsel's questions were not "testimony" nor "evidence." Likewise, although Kolberg directs us to ***Wilson v. State***, 451 So.2d 724, 726 (Miss. 1984), it is wholly inapplicable for precisely the same reasons. In ***Parker v. State***, 401 So.2d 1282, 1285 (Miss. 1981), we said: "Ordinarily counsel may not complain of slight or not seriously prejudicial impropriety in remarks or comments by the court where they are provoked by himself." ***Id.*** at 1285 (quoting ***Vail v. City of Jackson***, 206 Miss. 299, 328, 41 So.2d 357, 361 (1949)). We agree. This assignment of error is without merit.

### VIII. WHETHER KOLBERG WAS PERMITTED TO PROPERLY CROSS-EXAMINE EACH STATE WITNESS.

¶142. Kolberg next raises error with what he argues was improper cross-examination of one of his expert witnesses. Basically, he asserts that he was improperly limited in his cross-examination of Dr. Michael Vise, but that the trial judge did not apply the same rule to the State. As Kolberg's arguments regarding the cross-examination of Dr. Vise have already been discussed in section VII B, above, we will not revisit it again, although Kolberg attempts to do so.

¶143. The State asked A.K. Rosenhan, Kolberg's biomechanics expert, the following:

Q. Now, do you remember, Mr. Rosenhan, testifying again in Oktibbeha County in a case style Upchurch v. Rottenberry? Do you remember that?

A. Yes, sir. That was an automobile accident.

***

Q. And is it true, Mr. Rosenhan, that in that testimony after an overnight recess you went back into court and completely turned your testimony around with respect to what you smelled? Smelling alcohol?

Kolberg did not object to this line of questioning until the State attempted to have the witness read a portion of the case from the *Southern Reporter*. Defense counsel's basis for the objection was: "He can't impeach with that [i.e., the *Southern Reporter*], Judge. He has to get the transcript." His objection was overruled. The State is correct in noting that Kolberg has provided us with no citation to legal authority to support his claim that the State could not use the *Southern Reporter* to impeach the witness. Kolberg concedes his research revealed no case directly on point. Kolberg takes the position that this error was compounded because the opinion which the State had the witness read from was later withdrawn on rehearing. However, as pointed out by the State: "Rosenhan was under oath there at the time he gave his testimony. It did not somehow become unsworn because this Court relied upon his sworn statements in its opinion."

¶144. We believe that the State's attempted impeachment of Rosenhan was appropriate as it had a direct bearing on his competency as a witness, and credibility as an expert. Accordingly, we find no error in this method of impeachment.

¶145. Kolberg also asserts that it was error for the trial judge not to give a curative instruction. However, as there was no error in this method of impeachment, no curative instruction was necessary. This assignment of error is without merit.

### IX. WHETHER KOLBERG, THROUGH ALLEGED PROSECUTORIAL MISCONDUCT, WAS DENIED HIS RIGHT TO A FAIR TRIAL.

### A.

¶146. Kolberg tells us the State improperly injected emotionalism into the trial when, during opening statements, the prosecutor said: "Now, they have him dressed up in a sweater so he looks nice and fuzzy and warm. Don't let that fool you. This man beat to death an innocent baby girl. And I'm sorry if I get emotional. I have a baby myself, and it's hard to imagine anybody beating a baby to death. . . ." As pointed out by the State, defense counsel did not make a contemporaneous objection at the time the statement was made, but he did raise it at the close of opening statements in his motion for a mistrial. Kolberg also complains of the following remarks of the prosecutor made during closing arguments:

When I look at him I feel sick to my stomach. I think how could any human being - -

MR. SMITH: Your Honor, I must object to that. I'm sorry to interrupt but that's not proper.

THE COURT: Overruled.

MS. WOOTEN: (Continuing). It makes me sick to think that another person could take a baby, and look at her, look at those big blue eyes of hers, that what she had to have gone through as he was beating her in those 49 days.

Lastly, Kolberg tells us the State engaged in a "atavistic repartee" by arguing that its local doctors were better than doctors from out of state:

. . . and we're going to have doctors, local doctors that treated this baby girl. These are people that

work here in Mississippi, that practice here in Mississippi, that treated this baby in Mississippi, and what they're going to tell you is that when they saw this child in the condition that she was in, she couldn't breathe on her own. . .

¶147. Kolberg cites to *Smith v. State*, 499 So.2d 750, 756-57 (Miss. 1986) for our statement that "fundamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial as shown by the record before us." (citing *Tudor v. State*, 299 So.2d 682, 685 (Miss. 1974)). Yet, what was "shown by the record before us" was that the prosecution asked the defendant why he killed a person, but "[a]t the time the question was asked, there was no evidence in the record concerning the killing or death of [the victim], nor was there any evidence in the record that defendant had ever been convicted of a previous crime." *Id.* at 755. However, Kolberg correctly points out that we said in *Bridgeforth v. State*, 498 So.2d 796, 801 (Miss. 1986) that "a prosecutor should not indulge in personal abuse or vilification of the defendant."

¶148. Yet, as pointed out by the State, in *Wideman v. State*, 339 So.2d 1378 (Miss. 1976), we were confronted with statements by a prosecutor almost identical to those made here: " I don't think, that as long as I have prosecuted, I have seen a situation that has made me more sick to my stomach than what I have seen here today. Now I am going to tell you why. I've got four little daughters, two of which are the same age as this little lady over here, and I think about them, and I love them, and I want to protect them." *Id.* at 1381-82. We held these comments were improper and should not have been made. *Id.* at 1382. We said: "However, while we again admonish prosecuting attorneys of the dangers of reversal in going outside the record in their arguments, we do not think that the remarks in this case, under all the facts and circumstances, constitute reversible error." *Id.* We believe such is the case here, and consequently, this assignment of error is without merit.

¶149. As to Kolberg's atavism argument, we believe it is also without merit. Kolberg suggests that this somehow violates the privileges and immunities clause of the Fourteenth Amendment. Yet, we have found no authority that the "state action" contemplated by that amendment also encompasses a prosecutor's comments or arguments during trial. Kolberg provides us with no citation for such a proposition. Accordingly, this assignment of error is without merit.

## B.

¶150. Kolberg next claims that the State made "speaking objections" "where the State would try to impart prejudicial, and often false, information in their objections." He refers us to a point in the trial where the prosecutor believed she saw counsel for Kolberg shaking his head at Kolberg. The prosecutor objected, saying: "Your Honor, I object. I'm watching Mr. Smith and he's shaking his head." Kolberg vehemently denies this and tells us that this allegation was "flagrantly false." Yet, we agree with the State that the prosecutor was merely stating the ground for her objection. This assignment of error is without merit.

## X. WHETHER THE DEFENSE WAS IMPROPERLY LIMITED IN ITS CLOSING ARGUMENT.

¶151. Kolberg next claims that he was wrongly prevented from inquiring about Dr. Galvez's beliefs from other witnesses. The prosecution's hearsay objection was sustained. When Kolberg attempted to comment on Dr. Galvez's absence from the courtroom, the State's objection was sustained based on Dr. Galvez being a witness available to both sides. Kolberg now questions the trial court's sustaining of these two

objections.

¶152. As to questioning Dr. Galvez's credibility, Dr. Galvez did not testify because he was not called as a witness and his "investigations" were not introduced into evidence. The information Kolberg sought to elicit from other witnesses about Dr. Galvez's beliefs and opinions were hearsay. Therefore, this assignment of error is without merit.

¶153. Despite Kolberg's argument that Dr. Galvez was not a witness equally available to both sides, he has provided nothing in the record to support this claim. "This Court will consider only those matters that actually appear in the record and does not rely on mere assertions in briefs." *Touchstone v. Touchstone*, 682 So.2d 374, 380 (Miss. 1996)(citing *American Fire Protection, Inc. v. Lewis*, 653 So.2d 1387, 1390 (Miss. 1995)).

¶154. Our decision in *Fox v. State*, 756 So.2d 753 (Miss. 2000) is controlling here. "The party that wishes to make a comment about a witness that was not called has the burden of persuasion to prove that the witness was not equally available." *Id.* at 762. We said that the test for "availability" "depends on whether a party has so superior opportunity for knowledge of the witness, or else upon the relationship of the witness to the party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party and against the other." *Id.* at 761-62 (citing *Brown v. State*, 200 Miss. 881, 27 So.2d 838, 841 (1946). We also quoted from the decision in *Brown* as follows:

> Now the term 'available' in the connection in which we are using it does not mean merely available or accessible for the service of a subpoena, since any witness who may be found may be subpoenaed at the instance of either party to any cause. Quite to the contrary, the 'availability' of a witness to one or the other of the parties to an action depends either upon such party's superior means of knowledge of the existence or identity of the witness, or else upon the relationship of the witness to the party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party and against the other. In other words, a witness may properly be said to have been peculiarly 'available' to one party to an action, so that upon that party's failure to have produced him in court an inference arises that his testimony would have been unfavorable, when such party had so superior an opportunity for knowledge of the witness, or there was such a community of personal interest between the party and the witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that it was known or feared that his testimony would be damaging rather than favorable."

*Fox*, 756 So.2d at 762, n.1 (quoting *Brown*, 200 Miss. at 889-90, 27 So.2d 838, 841). We believe Kolberg has presented nothing to establish Dr. Galvez was not equally available to him within the meaning of *Fox*. Consequently, this assignment of error is without merit.

### XI. WHETHER JURORS WERE TAINTED BY KNOWLEDGE OF KOLBERG'S PRIOR CONVICTION AND INCARCERATION.

¶155. Kolberg makes two complaints under this heading: (1) that during voir dire veniremen knew that he had been incarcerated at Parchman, and (2) that during the trial the State's witnesses informed the jury that he had previously been convicted of this crime.

¶156. As to the first complaint, we believe it is without merit. The quotations from the individuals Kolberg gives us is not persuasive, for as the State points out, these veniremen were not chosen to sit on the jury. The decision to quash the venire is a matter entrusted to the sound discretion of the trial court. *Evans v. State*, 725 So.2d 613, 649 (Miss. 1997); *Street v. State*, 754 So.2d 497, 505 (Miss. Ct. App. 1999). Thus, we agree with the State's assertions that the venire members of whom Kolberg complains did not serve on the jury and there is nothing to indicate these individuals corrupted the entire jury; therefore, the trial judge did not abuse his discretion in refusing to quash the entire venire.

¶157. Kolberg's second complaint is also without merit. Although the State concedes it did not instruct its witnesses not to mention Kolberg's first trial in this case, there is nothing to indicate the State intentionally had the witnesses testify to such. The quotations Kolberg cites to us are clearly spontaneous utterances from the mouths of the witnesses, and not purposely calculated to taint the jury. We again agree with the State that "[t]his Court has repeatedly and consistently held that [instructions to the jury to disregard inadmissible testimony] is sufficient to remove any prejudice resulting from the improper testimony." *Hoops v. State*, 681 So.2d 521, 5280 (Miss. 1996). The trial judge offered to instruct the jury to disregard the statements, and did so instruct the jury. Consequently, this assignment of error is without merit.

## XII. WHETHER THE TRIAL COURT IMPROPERLY FAILED TO GRANT VARIOUS CHALLENGES FOR CAUSE.

¶158. Kolberg next complains that the trial judge erred by refusing to grant two challenges for cause.

> This Court has held on more than one occasion that when a trial court fails to sustain a challenge for cause by the defense, it must be shown that the defense had exhausted all of its peremptory challenges before the trial court's refusal to allow the challenge for cause.

*Evans v. State*, 725 So.2d at 652 (citations omitted). Kolberg used two of his peremptory challenges to remove both of the individuals of whom he now complains. Consequently, there is no basis for this assignment of error.

## XIII. WHETHER THE TRIAL COURT IMPROPERLY EXCLUDED VARIOUS JURORS.

¶159. Kolberg next tells us one juror was improperly excluded for cause. The standard of review for the decision to grant or deny a challenge for cause is abuse of discretion. *Sewell v. State*, 721 So.2d 129, 135-36 (Miss. 1998). A review of the record indicates this individual gave conflicting answers regarding his opinion of the death penalty, one moment saying he was in favor of the death penalty, but not the way the death penalty is handled, and then contradicting himself by saying "I am against the death penalty because it may be me one day." The following discussion also bears great light on the reasoning behind the trial judge's decision:

> Q. My question to you is, as a juror, is it your position that you would never consider giving anyone the death penalty, that it would always be life, as you've said on your form?

> A. Yes.

> Q. And that's the honest truth?

A. Yes.

Q. And you are against the death penalty; am I correct?

A. Yes, sir, because it could be me one day.

Q. One thing that I noticed when we were during voir dire, you said once I make up my mind I'm not willing to change it. Is that still the way you feel?

A. Yes, sir.

Q. And so are you telling us on your oath that you are against the death penalty and you would always vote for life and never vote for death?

A. Excuse me now?

Q. Are you telling us on your oath that you would always vote for life and never vote for death? There's nothing wrong with that. I'm just asking you if that's what you're saying.

A. Yes, sir. That's what I said. Yes, sir.

Q. And once you make up your mind, you're not willing to change it, and that's the way you feel; am I correct?

A. That's the way I feel, yes, sir.

Q. And no matter what anyone says to you, you're not going to change your mind. That's what it is.

A. Yes, sir.

Q. Life and never get death; am I right?

A. Uh-huh.

Therefore, it is without question that the trial judge did not abuse his discretion. This assignment of error is without merit.

### XIV. WHETHER THE PROSECUTION VIOLATED *BATSON v. KENTUCKY* IN ITS STRIKING OF JURORS.

### A.

¶160. Kolberg tells us reversal is warranted here because the State gave pretextual reasons for striking black jurors and because the trial judge did not make on-the-record determinations that the State's ***Batson*** strikes are race neutral.

¶161. "Realizing the importance of credibility and first-hand observation, this Court has adopted a standard of review for ***Batson*** claims that accords 'great deference' to a trial judge's factual findings, reversing only where the finding of the lower court was clearly erroneous or against the overwhelming weight of the evidence."***Kolberg I***, 704 So.2d at 1312. The burden is on the defendant to establish a prima facie case. ***Id.*** at 1312-13. Once the defendant establishes a prima facie case, the prosecution must supply racially-

neutral reasons. *Id.* at 1313. "The degree of justification required does not rise to the level required for challenges for cause." *Id.* "The defendant may then rebut the reasons offered by the prosecution." *Id.*

¶162. Kolberg's assignment of error relates to three individuals. The record reflects Kolberg did object to all three. The State offered race-neutral reasons for all three. With respect to juror Seaton, the State asserted it challenged her because she hid the fact during voir dire that her brother's son had been charged with a crime. The State asserted it knew for a fact that a relative had been charged with a crime because "we have been arresting the Stamps for the 25 years I've been D.A." Accordingly, the State felt that she was intentionally keeping this information from them. With respect to juror Leonard, the State challenged her because she could not rely on circumstantial evidence in a criminal case and because she was nodding at defense counsel. Lastly, the State challenged juror Martin because he "said that he thought that death was not an appropriate punishment in a child killing case, and it should be life." The State also asserted Martin kept from them the fact that he was close friends with a person who had been charged with multiple homicides. It was then up to Kolberg to rebut the reasons offered by the State, and his counsel attempted to do so. In the end, the trial judge accepted the State's reasons for exercising peremptory challenges on these jurors as being race-neutral reasons; however, Kolberg complains that the trial judge did not make sufficient on-the-record determinations that the State's *Batson* claims were sufficiently race-neutral. Kolberg cites *Hadden v. State*, 628 So.2d 294, 298 (Miss. 1993), wherein we stated: "[I]t [is] necessary that trial courts make an on-the-record, factual determination, of the merits of the reasons cited by the State for its use of peremptory challenges against potential jurors." Kolberg tells us the trial judge failed to do so in this case and reversal is warranted. The State responds by stating that the trial judge "accomplished this task. We do not believe this Court has ever required an exhaustive finding by a trial court in this regard, only a finding. Only in one instance was there an actual factual dispute as to the grounds for the challenge, and the court resolved this by a specific finding." There simply is not a *Batson* violation. *Hatten* concluded with the admonition: "in determining which explanations are sufficiently race-neutral and which are not, (the trial judge) should give an equally 'clear and reasonably specific' explanation for his ruling." *Id.* at 299.

¶163. Moreover, this Court said in *Hatten*, "We place our trust in the trial judges to determine whether or not a discriminatory motive underlies the prosecutor's articulated reasons." *Id.* at 299 (citing *Lockett v. State*, 517 So.2d 1346, 1352 (Miss. 1987). A review of the record reveals the totality of the responses given by these particular jurors during voir dire, the State's reasons for striking the jurors, Kolberg's responses to the State's reasons, and the trial judge's findings, which referenced the State's reasons. Keeping in mind the great deference we afford to trial judges concerning *Batson* claims, the trial judge's findings that sufficient race-neutral reasons had been offered by the State in striking these jurors were not clearly erroneous nor against the overwhelming weight of the evidence. Accordingly, this assignment of error is without merit.

**B.**

¶164. Kolberg and the State both challenged the composition of the jury pool; however, the challenges were overruled. Kolberg now tells us that this is reversible error because the jury pool was not representative of the county. Notwithstanding this argument, this Court, in *Simon v. State*, 688 So.2d 791 (Miss. 1997), stated:

> [I]n *Lanier v. State*, 533 So.2d 473 (Miss. 1988) this Court outlined the elements necessary to establish a prima facie violation of the fair cross-section requirement for an impartial jury:

1) the group alleged to be excluded is a "distinctive" group in the community;

2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

3) this under representation is due to systematic exclusion of the group in the jury selection process.

*Simon*, 688 So.2d at 806 (citing *Lanier*, 533 So.2d at 477)(quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)).

¶165. The State correctly argues that there was no establishment of a prima facie violation of the "fair cross-section requirement, because there was no attempt to prove element number three of the *Duren* test. Consequently, this assignment of error is without merit.

## XV. WHETHER THERE WAS A DENIAL OF THE RIGHT TO PRESENT A DEFENSE.

### A.

¶166. Kolberg wanted to call his brother, sister, and wife as witnesses to testify "on the question of how [Kolberg] was with children." Over the State's objection, the trial court ruled that such testimony would be permissible under Miss. R. Evid. 404(a)(1). After this ruling by the trial judge, the following motion arguments were heard outside the presence of the jury:

MR. SMITH: Your Honor, and on that I would make a motion in limine, Your Honor, that the state not be permitted to explore issues such as whether Mr. Kolberg paid child support, which was done at the last trial.

THE COURT: I would overrule that because character, if you vouch for his character, then they are certainly entitled to go into those areas which indicate bad character.

MR. SMITH: But the thing about it, Judge, is they could do it if perhaps there was any factual basis for it. We have certified copies of all of Mr. Kolberg's child support payments, and he was way ahead of paying his child support at the time he was arrested. Now Dawn Kolberg at the last trial testified that, in fact, he was behind on child support, but that was in 1990 after he had been locked up two years. So - - and he wasn't actually served with papers about child support nonpayment until he was up at Parchman.

THE COURT: Well- -

MR. DE GRUY: An additional point on that, Your Honor, we are introducing a pertinent trait. We are not introducing his entire character. Nonpayment of child support is not the same thing as violence or abuse to children, or otherwise.

THE COURT: Mr. De Gruy, I don't think you can open the issue of character and then close the door on the state bringing out evidence on the same issue. It is - - the fact that you are asking narrow questions doesn't restrict the state's ability to go into other areas of the defendant's character once you put that question at issue.

So I am going to allow the testimony. I feel like the rules clearly require that I do so. But the motion in

limine would be overruled.

MR. SMITH: So the Court's ruling is if we put those witnesses up there they can be impeached at least by questions about whether he was behind on child support payment?

THE COURT: Yes, sir.

MR. SMITH: In light of that ruling, Your Honor, and I think the case - - this is off the top of my head - - United States v. Cross. We are not going to call them, but we would like to proffer what their testimony would be.

THE COURT: All right.

MR. SMITH: And their testimony would be basically from both Gary and Katie that Bryan was lenient with children and various instances and examples over the years of him being good with kids and the fact that he never abused them. And then we would mark for identification the aspects of Dawn Kolberg's testimony - - we will mark this as defense Exhibit 68. That we would expect to present and the ones we would present. . .are essentially the ones that are highlighted.

Kolberg now asserts this ruling denied him the right to present a defense because evidence of non-payment of child support was not relevant to his non-violent character with his own children. He also tells us this ruling was unfair because he could not pay child support because he had been in jail, and explaining that to the jury would "further prejudic[e] Appellant's rights."

¶167. Under Miss. R. Evid. 404(a)(1), Kolberg was allowed to present evidence of his character as being good with his own children. However, as appropriate ruled by the trial judge, once Kolberg introduced that testimony, then, pursuant to Miss. R. Evid. 404(a)(1) evidence of his character or trait of character could be introduced "by the prosecution to rebut the same." Consequently, Kolberg was not denied the right to present his defense, because the trial judge ruled he could call the three witnesses to testify. Kolberg elected not to call these witnesses so as not to open the door to this evidence. This assignment of error is without merit.

**B.**

¶168. After the State questioned Dr. Vise during its rebuttal, counsel for Kolberg attempted to question Dr. Vise regarding his view that all of the defense expert witnesses had been paid "big money" and were simply "hired guns." The State's objection to this question was sustained, and Kolberg now asserts this prevented him from showing Dr. Vise's bias.

¶169. The record reflects that this question occurred during defense counsel's cross-examination of Dr. Vise in the State's rebuttal. During the State's direct examination of Dr. Vise in its rebuttal, nothing close to this testimony was elicited. Dr. Vise had already testified in the State's case in chief, and defense counsel's cross-examination of Dr. Vise in the State's case in chief consumed 116 pages of the transcript. Thus, by the trial court's sustaining the State's objection to defense counsel's question posed to Dr. Vise on cross-examination during the State's rebuttal, it can hardly be said that Kolberg was prevented from showing any perceived bias on the part of Dr. Vise.

¶170. Kolberg also complains that the State's objection was sustained to his question about a grandmother

not being charged with child abuse because she had the event on video tape. We agree with the State that this question was beyond the scope of redirect, and this assignment of error is also without merit.

¶171. Finally, Kolberg complains that he was not allowed to prove the unreliability of evidence relied on by the State. This claim again involves Kolberg's attempt to impeach Dr. Galvez. Again, Dr. Galvez was not a witness at this trial, did not testify at this trial, and Kolberg again attempted to rely on and elicit hearsay. This assignment of error is without merit.

## XVI. WHETHER KOLBERG HAS BEEN DENIED SPEEDY PROCEEDINGS.

¶172. Kolberg filed a motion to bar his retrial based on the denial of speedy proceedings. He also tells us that when the State sought a continuance, he filed another motion which opposed any continuance. He argues before us that the delay in his first trial, the delay in his appeal, and his delay in the second trial warrant a reversal and dismissal here.

¶173. We addressed the issue of delay in his first trial and held it was without merit. ***Kolberg I***, 704 So.2d at 1318-19. As to his claim for the denial of a speedy appeal, we did not find his claim to be without merit; however, we also stated in ***Kolberg I*** that "[t]he remedy for denial of a speedy appeal is not clear since this Court has never recognized such a right and does not do so now." ***Id.*** at 1320. However, we did not determine what the remedy should be as we were reversing the case on other grounds. ***Id.***

¶174. As pointed out by the State, although Kolberg filed a motion to dismiss or prevent the second trial asserting speedy trial violations, there were no hearings or orders on these motions. Thus, Kolberg is not appealing to us from an erroneous decision of the trial judge. In ***Rushing v. State***, 711 So.2d 450, 456 (Miss. 1998), we stated: "It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and a failure to do so constitutes a waiver of the same." (citations omitted). Accordingly, this assignment of error is without merit.

## XVII. WHETHER THE TRIAL JUDGE SHOULD HAVE BEEN RECUSED FROM THE TRIAL OF THIS CASE.

¶175. Kolberg sought the recusal of the trial judge. He asserts it was error for the trial judge not to recuse himself "because of the conflict of interest in the same court being liable in a civil action for the violation of Appellant's speedy appellate rights." Kolberg has not yet filed this civil action.

¶176. ***Evans v. State***, 725 So.2d 613 (Miss. 1997), offers guidance here. One issue with which we were confronted in ***Evans*** was "whether the filing of a civil rights lawsuit against the trial judge by a criminal defendant requires recusal." ***Id.*** at 677. We reaffirmed our standards for judicial recusal:

> The standard by which the Court determines if a Judge should have disqualified himself or herself, is an objective standard under Canon 3.[(5)] "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." (Internal citations omitted). The presumption is "that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a 'reasonable doubt' (about the validity of the presumption)[.]" (Internal citations omitted). When a judge is not disqualified under the constitutional or statutory provisions, "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." (Internal citations omitted). Under the appropriate standard, the judge is presumed qualified and unbiased. This

presumption may only be overcome by evidence showing beyond a reasonable doubt that the judge was biased or not qualified. If a reasonable person, knowing all the circumstances, would doubt the judge's impartiality, the judge is required to recuse him or herself from the case.

*Id.* at 677-78 (quoting **Collins v. Joshi**, 611 So.2d 898, 901 (Miss. 1992)). We went on to hold that "the mere filing of a lawsuit, wherein a prisoner is allowed to proceed in forma pauperis, is insufficient to require recusal of a trial judge named as a defendant in that lawsuit where there is no evidence in the record which demonstrates that the trial judge is biased or unqualified." *Id.* at 678-79.

¶177. Turning to the case at hand, there has been no lawsuit filed against the trial judge, but instead only Kolberg's expression of his intention to do so. Accordingly, if the mere filing of a lawsuit, without more, is insufficient to require recusal, then so to is the mere intention to file a lawsuit, without more, insufficient. There is nothing in the record to indicate that the trial judge was biased or otherwise disqualified when it came to Kolberg's case. There is certainly nothing which would establish bias beyond a reasonable doubt. Accordingly, this assignment of error is without merit.

## XVIII. WHETHER THE OFFICE OF THE DISTRICT ATTORNEY SHOULD HAVE BEEN DISQUALIFIED FROM PROSECUTING THIS CASE.

¶178. Kolberg next asserts that he filed a motion to disqualify the Office of the District Attorney. According to Kolberg, this motion was sealed by the trial court to protect the District Attorney, and that a hearing should have been held. Further, he asserts that we have this sealed motion. However, after careful review of the entire contents of Kolberg's records and pleadings to us, we have found no such sealed motion. With no motion, we have no facts, inasmuch as he asserts they are set forth in great detail in the sealed motion. Therefore, there is nothing presented to us for consideration.

¶179. Next, Kolberg's expresses a grievance with his motion for equitable plea bargain. There was evidently no hearing on this motion, and consequently, this issue is deemed waived for the same reasons as discussed above ( "[I]t is the responsibility of the movant to obtain a ruling from the court on motions filed by him and a failure to do so constitutes a waiver of the same." **Rushing v. State**, 711 So.2d 450, 456 (Miss. 1998) (other citations omitted)). Kolberg does not refute this in his reply brief. Accordingly, this assignment of error is without merit.

## XIX. WHETHER CUMULATIVE ERROR IN THIS CASE MANDATES REVERSAL.

¶180. In **Lentz v. State**, 604 So.2d 243, 249 (Miss. 1992), this Court held: "Even where error has occurred, we will not reverse a conviction when the overwhelming weight of the evidence supports the guilty verdict." (citations omitted). Additionally, this Court, in **Simmons v. State**, 805 So. 2d 452 (Miss. 2001), held that the cumulative effect of errors, even in a murder trial, will not warrant reversal. Also cited in **Simmons** was **Doss v. State**, 709 So.2d 369, 401 (Miss. 1997), which held: "Most of Doss's assigned errors are subject to a procedural bar as well as alternatively being without merit. These assignments of error, taken alone or cumulatively, do not warrant a reversal of Doss's conviction and death sentence."

¶181. This Court is, however, ever mindful of the fact that we have held that "[w]hen the combination of specific errors, while harmless in each instance, accrued to such an extent that a defendant was denied a fair trial, this Court will reverse for cumulative error." **Hughes v. State**, 735 So.2d 238, 280 (Miss. 1999). After considering the applicable case law and the record before us, we are satisfied that there is no

aggregation of harmless error, nor cumulative error in this case which would justify reversal. This assignment of error is without merit.

## CONCLUSION

¶182. As indicated, we have found that during this protracted litigation, there were instances of error committed by the trial court. With the literally hundreds of difficult decisions which the trial court was called upon to make, many of which had to be made with only a few seconds of deliberation, errors will be made. That is a fact of life. However, we have never held that a defendant in a criminal trial was entitled to a perfect trial. In this world, that is impossible. The defendant was, however, entitled to a constitutionally fair trial under our state and federal constitutions. We are satisfied that Bryan Kolberg did receive a constitutionally fair trial. There was overwhelming circumstantial evidence of Kolberg's guilt presented to the jury, which in turn was justified in its finding that Bryan Kolberg was guilty of capital murder for the senseless killing of young Madison Watson. For the foregoing reasons, the judgment of conviction and sentence pronounced in the Circuit Court of the First Judicial District of Hinds County are affirmed.

¶183. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, P.J., WALLER, COBB AND EASLEY, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. PITTMAN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. GRAVES, J., NOT PARTICIPATING.**

**PITTMAN, CHIEF JUSTICE, DISSENTING:**

¶184. I am convinced the trial court's failure to instruct the jury on the elements of the underlying felony of child abuse proves fatal to any effort to affirm the jury's verdict. Our case law states, without a doubt, that the failure to instruct on the elements of a crime requires automatic reversal. *See Ballenger v. State*, 761 So. 2d 214 (Miss. 2000); *Shaffer v. State*, 740 So. 2d 273 (Miss. 1998); *Hunter v. State*, 684 So. 2d 625 (Miss. 1996). The majority, however, analyzes this mistake through the rubric of harmless error and glosses over the lack of substance as to what constitutes felony child abuse in the instruction S-2. Finally, the majority differs from, without overruling, our decisions in *Hunter*, *Shaffer*, and *Ballenger*; an action I find improvident. *Hunter*, *Shaffer*, and *Ballenger*, announce law that should be followed, not ignored. Therefore, I must respectfully dissent.

¶185. The majority overextends the rule from *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In *Neder*, the trial judge declined to instruct the jury on the "materiality of any false statements" with respect to certain fraud charges, one element of several of the many non-capital crimes of which the defendant was ultimately convicted. *Id.* at 7, 119 S.Ct. at 1832. While the United States Supreme Court did indeed conclude that withholding instruction from the jury on that one element was subject to a harmless error analysis, there are two factors I find of such importance as to prohibit *Neder* from applying to the instant case: the utter lack of instruction to the jury on any element of child abuse and the severity of the punishment Kolberg faced if convicted. These two factors are indispensable structural elements and, as a result, the failure to instruct the jury on the underlying offense is a fundamental error violating his right to a trial by jury. *See id.*, at 9, 119 S.Ct. at 1833 (citing *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)); *Screws v. United States*, 325 U.S. 91, 107,

65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945); **Hunter**, 684 So. 2d at 636. *See also* **Apprendi v. New Jersey**, 530 U.S. 466, 477, 120 S.Ct. 2348, 2356, 147 L.Ed.2d 435 (2000).

¶186. In its discussion of this issue, the **Neder** Court limits its holding to cases where the jury was not instructed on a single element of an offense by constantly referring to the missing element in the singular form. **Neder**, 527 U.S. at 9-16, 119 S.Ct. at 1834-37. It, therefore, does not stand for the proposition that a total failure to instruct the jury on *any* of the elements of the underlying offense of a capital murder can be reviewed for harmless error. Thus, **Neder** provides no direction for the facts at bar. However, the situation facing us here was addressed by Justice Scalia in his separate opinion in **Neder**:

> The Court's decision would be wrong even if we ignored the distinctive character of this constitutional violation. The Court reaffirms the rule that it would be structural error (not susceptible of "harmless-error" analysis) to "'vitiat[e] *all* the jury's findings.'" A court cannot, no matter how clear the defendant's culpability, direct a guilty verdict. The question that this raises is why, if denying the right to conviction by jury is structural error, taking *one* of the elements of the crime away from the jury should be treated any differently from taking *all* of them away-since failure to prove one, no less than failure to prove all, utterly prevents conviction.

> The Court never asks, much less answers, this question. Indeed, we do not know, when the Court's opinion is done, *how many* elements can be taken away from the jury with impunity, so long as appellate judges are persuaded the defendant is surely guilty. What if, in the present case, besides keeping the materiality issue for itself, the District Court had also refused to instruct the jury to decide whether the defendant signed his tax return? See 26 U.S.C. § 7206(1). If Neder had never contested that element of the offense, and the record contained a copy of his signed return, would his conviction be automatically reversed in that situation but not in this one, even though he would be just as obviously guilty? We do not know. We know that all elements cannot be taken from the jury, and that one can. How many is too many (or perhaps what proportion is too high) remains to be determined by future improvisation.

**Neder**, 527 U.S. at 32-33, 119 S.Ct. at 1845 (Scalia, J., concurring in part and dissenting in part) (emphasis in original). This passage proves to be more instructive on the facts we have before us.

¶187. Here, the only guidance the trial court gave the jury on the elements of child abuse when instructing them is contained in instruction S-2 which reads in relevant part, "when engaged in the commission of the crime of felonious child abuse and/or battery." Not only does this instruction leave out a singular element of the underlying offense, it omits them all. According to our child abuse statute, felony child abuse consists of three elements: (1) intentionally (2) burning or torturing (or whipping, striking or otherwise abusing or mutilating in such a manner as to cause serious bodily harm, except in self-defense or in order to prevent bodily harm to a third party) (3) any child. Miss. Code Ann. § 97-5-39(2) (2000). As a matter of fact, the S-2 instruction actually comes directly from the capital murder statute, which dutifully enumerates the elements of capital murder but not child abuse. Miss. Code Ann. § 97-3-19(2)(f) (2000).

¶188. As can be seen from examining the full instruction found in the majority's opinion or from the quoted passage here, even if one squints really hard, the instruction provides no guidance to an inquiring jury on what constitutes felony child abuse. Therefore, **Neder** does not address the situation before us. It is a mistake to affirm the jury's verdict by harmless error analysis when the case cited for doing so does not dictate its application to facts such as these where the jury was not instructed at all concerning the elements

of the underlying felony. This is not the only reason the majority errs in affirming Kolberg's verdict.

¶189. Before the jury returned a sentence in this case, Kolberg faced the prospect of his life being ended by the State as executioner. If he were condemned to death, we would have reviewed his case with what we repeatedly call "heightened scrutiny" and operated under the theory that what constituted harmless error in a case with less at stake would become reversible error. *See Knox v. State*, 805 So. 2d 527, 530 (Miss. 2002). *See also Hughes v. State*, 735 So. 2d 238, 248 (Miss. 1999)(this standard is our response to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)). Even though the "heightened scrutiny" standard does not apply here, what the majority announces today is a standard of appellate review, not practical guidance to the practitioners of criminal law and the officers of the court who will be confronted with the opportunity to rectify the error of incomplete jury instructions before it comes before us. Had Kolberg been sentenced to death, I suggest it would be doubtful that this Court could justify imposing the death penalty upon him where the jury was not instructed on the elements of the underlying offense. Therefore, I remind the prosecutors around this State of their burden of presenting acceptable instructions to the jury on the elements of any underlying offense. *Hunter*, 684 So. 2d at 636. It is incumbent upon them, and the trial judges as well, to see that substantial justice is provided to defendants in this State, even where a defendant does not submit an acceptable or complete jury instruction. *Id.*

¶190. The majority affirms a unique jury verdict today. It is one that we cannot say indicates that Kolberg is guilty of capital murder any more so than ordinary murder because we have no way of knowing whether the jury understood what constitutes felony child abuse. However, the majority now declares we have the power to determine guilt on the underlying felony by reviewing the facts indicating the defendant's overwhelming guilt. There is danger in affirming the verdict in the case at bar. In doing so, we remove from the jury an important function ordinarily within its province. This invasion is distinct from finding harmless error in the improper submission of evidence to the jury. It is assuming that we, in our position as an appellate court, can pick through the instructions offered to the jury to find a plank large enough to rest a capital murder conviction upon rather than giving the jury the opportunity to address the question of guilt on the underlying felony. Where the jury is not instructed on the underlying offense at all, I cannot find support for its capital murder verdict.

¶191. Our decisions in *Hunter*, *Shaffer*, and *Ballenger* represent the wiser rule when meting out justice in this State, and they should not be ignored or discarded. This case should be reversed and remanded for a new trial. For these reasons, I respectfully disagree with the majority.

**DIAZ, J., JOINS THIS OPINION.**

1. Thus, the State's argument that res judicata also precludes Kolberg from making this sufficiency argument is without merit.

2. Because the two sub-issues Kolberg raises under this allegation of error continuously overlap, we combined the two for the sake of simplicity.

3. *Houston* involved a case which was tried in December, 1985, prior to the effective date of the *Mississippi Rules of Evidence*, that date being January 1, 1986.

4. The State tells us in its brief that the trial judge "declined a final ruling concerning this motion, specifically stating that he would consider the matter again if renewed by the defense at the time the state began to

introduce such evidence." However, the State fails to provide any citation to the record. Our review of the record indicates the State's assertion is true with regard to Kolberg's objections to the State's reference to the abrasions found on Madison's body. Yet, it appears from the record the trial judge did issue a final ruling during the pretrial hearing on Kolberg's motion in limine against testimony of prior instances of abuse.

5. On April 4, 2002, this Court adopted a new Code of Judicial Conduct, and the appropriate language addressing this issue may now be found in Canon 3 E. (1) of the new Code and the Commentary thereunder.